[No. H019844. Sixth Dist. Dec. 8, 2000.]

ANDREW P. PAVICICH, JR., et al., Cross-complainants and Respondents, v.
ANTHONY H. SANTUCCI, Cross-defendant and Appellant.

[No. H020472. Sixth Dist. Dec. 8, 2000.]

LOS GATOS BREWERY LIMITED PARTNERS, Plaintiff and Respondent, v.
ANTHONY H. SANTUCCI, Defendant and Appellant.

COUNSEL

Anthony H. Santucci, in pro. per.; and David C. Johnson for Defendant and Appellant and for Cross-defendant and Appellant.

Sherwood M. Sullivan; Hopkins & Carley, Arthur V. Plank and Philippe A. Toudic for Plaintiff and Respondent and for Cross-complainants and Respondents.

OPINION

**ELIA, J.**—Appellant Anthony H. Santucci, an attorney, demurred to the complaints and cross-complaints of respondents Los Gatos Brewery Limited

Partners, Andrew P. Pavicich, Jr., and Los Gatos Brewing Company, Inc. Among other things, Santucci alleged that respondents did not comply with Civil Code section 1714.10, concerning actions against an attorney for civil conspiracy.[1] The trial court twice overruled Santucci's demurrers as to the conspiracy causes of action. It found that section 1714.10 did not apply. We affirm.

### Facts and Procedural Background

We treat as true the material allegations of respondents' pleadings. (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1087 [23 Cal.Rptr.2d 101, 858 P.2d 568].) Those allegations are as follows:

In June 1991, Robert Keller, Thomas Earle, Thomas Ferrito and Martin Feldman formed a joint venture. The joint venture was formed to develop a brewery and restaurant in Los Gatos, California.

In connection with the proposed development, the joint venturers created the Los Gatos Brewing Company, Inc. (the Corporation) but no stock was issued.

The joint venture tried to obtain a lease on a commercial site in downtown Los Gatos for the brew pub. Before the lease was secured, however, Keller, Earle, Ferrito and Feldman decided to dissolve the joint venture. Keller, Earle, Ferrito and Feldman entered into a settlement agreement and mutual release (the Release) dissolving the joint venture. The Release purported to give each member an equal opportunity to pursue the lease the joint venture had been seeking. The Release also effected a disorganization of the Corporation that the original joint venture had formed.

Before the joint venture was dissolved, Theodore Wallace secretly obtained the right to lease the premises sought for the brew pub. Wallace subsequently formed a second joint venture with Keller and Earle. This second joint venture was created to continue development of the brew pub concept. The second joint venture reorganized the Corporation. Keller, Wallace, and Earle became the officers and directors of the Corporation. Each also became an owner of one-third of the corporate shares of stock.

On September 30, 1991, the Los Gatos Brewery Limited Partners (the Limited Partnership) was formed. The Limited Partnership was created to solicit limited partnership investments. The Corporation was the sole general partner.

---

[1] All further unspecified statutory references are to the Civil Code.

During this period, Santucci acted as counsel to both the Corporation and the Limited Partnership. He was also the attorney for Keller.

In early August 1991, Ferrito and Feldman sent letters to Santucci and Wallace. In the letters, Ferrito and Feldman, who were both attorneys, charged that the Release, which dissolved the original joint venture, had been procured by fraud. Ferrito and Feldman accused Wallace of acting as a "strawman" for Keller and Earle by obtaining an "option" to lease the brew pub premises before the Release had been signed, thereby depriving Feldman and Ferrito of the opportunity. Feldman and Ferrito's letter threatened litigation.

On or after September 30, 1991, Wallace, Keller, Earle, and Santucci prepared a private placement memorandum to solicit limited partners for the Limited Partnership.

In late 1991 and early 1992, the brew pub project was experiencing severe financial difficulties. Wallace, Keller, Earle and Santucci recognized the need to find an investor to provide a substantial infusion of cash. Keller approached respondent Pavicich and proposed that Pavicich invest in the project.

As discussions on the subject progressed, Wallace, Keller, and Santucci agreed to persuade Pavicich to invest in the project without disclosing the claims of Ferrito and Feldman or their threat of litigation.[2]

On one or more occasions prior to making an investment, Pavicich met with Wallace, Keller and Santucci, in Santucci's office. Pavicich specifically asked if there was anything he should know about the early days of the joint venture before investing. Santucci and Keller told Pavicich there had been "negotiations" with "two Los Gatos businessmen" which had not been fruitful. Santucci also told Pavicich that Keller, Earle and the "two businessmen" had signed a legally binding release to avoid any future problems or claims.

According to the allegations in the complaint and cross-complaint, Wallace, Keller and Santucci failed to disclose that Ferrito and Feldman, the two attorneys described as Los Gatos "businessmen," claimed that the Release had been procured by fraud, or that Ferrito and Feldman had threatened litigation.

On February 6, 1992, Pavicich agreed to invest in the venture. He purchased two limited partnership units in the Limited Partnership for

---

[2]Earle developed terminal cancer and was no longer participating in the management of the project at this time.

$100,000. He also purchased a one-third interest in the Corporation for $16,667. At this time, Wallace and Keller together owned two-thirds of the stock of the Corporation, and exercised control of the board of directors of the Corporation. Besides being a minority shareholder, Pavicich became a director and chief financial officer of the Corporation.

Shortly after Pavicich invested, attorneys representing the Estate of Earle demanded that Earle's shares be reissued in the name of his widow, and that the Corporation reimburse any funds advanced to it by Earle. Wallace, Keller and Santucci held one or more meetings with the estate's attorneys. At these meetings, the claims of Feldman and Ferrito, and their threats of litigation, were discussed. Pavicich was not informed of these meetings, even though he was an officer, director and minority shareholder of the Corporation.

After a period of negotiation, on March 1, 1992, the Corporation, Wallace, Keller, Pavicich and the widow of Earle, entered into a buy-out and release agreement. Among other things, the agreement provided for the release and indemnification of the Estate of Earle for any liability arising out of Earle's involvement in the brew pub project. During the negotiations for the buy-out and release agreement, Pavicich specifically asked Santucci, Wallace and Keller whether there were any potential claims he should know about before agreeing to indemnify the Estate of Earle. Pavicich was assured that there was nothing to be concerned about.

By April 1992, it had become apparent that the brew pub project, then under construction, needed additional funding. On July 6, 1992, Pavicich agreed to loan the Limited Partnership $600,000, in exchange for which Pavicich acquired 70 percent of the stock of the Corporation and became its president.

On or about July 23, 1992, Ferrito and Feldman filed their lawsuit. Their complaint named as defendants, Wallace, Keller, the Estate of Earle, the Corporation and the Limited Partnership. In 1993, Pavicich was also named as a defendant. According to the allegations in the Feldman and Ferrito complaint, the Release, which dissolved the original joint venture, had been procured by fraud. The complaint further alleged that Wallace acted as a "strawman" for Keller and Earle, with whom Wallace had secretly agreed to obtain an "option" to lease the brew pub premises before the Release had been signed. Ferrito and Feldman sought compensatory and punitive damages, as well as a judicial declaration that they were entitled to a one-half or greater ownership interest in the Corporation, the Partnership and/or the business of the brew pub.

The Ferrito and Feldman suit embroiled the Corporation and Limited Partnership in more than four and one-half years of litigation. In May 1996, the Corporation paid $50,000, plus defense costs, to settle the indemnity claims of the Estate of Earle. In February 1997, the Feldman and Ferrito lawsuit went to trial but was settled after a court sponsored mediation. The Limited Partnership agreed to pay $500,000 to settle the Ferrito and Feldman claims while Wallace agreed individually to pay an additional $250,000.

Wallace then filed suit against Pavicich and the Corporation, seeking damages for a breach of a promise to indemnify after settlement of the Ferrito/Feldman lawsuit.

In September 1998, the Corporation and Pavicich cross-complained against Wallace, Keller, and Santucci. A separate complaint against Wallace, Keller, and Santucci was filed by the Limited Partnership.

Both the complaint and cross-complaint contain similar allegations. In both pleadings, it is alleged that Santucci was the attorney for the Corporation, Limited Partnership, Keller, and beginning around the middle of 1992, for Pavicich. In both the complaint and cross-complaint, the fifth cause of action alleges a conspiracy between Santucci, Wallace and Keller. The complaint and cross-complaint allege that Santucci, Wallace and Keller conspired to conceal the threats of litigation made by Feldman/Ferrito. Specifically, the pleadings allege: "The Limited partnership is informed and believes, and on that basis allege [sic], that at or prior to the time Pavicich and other investors each first had communications with any of the defendants regarding the brewpub project, defendant Wallace, defendant Keller, and defendant Santucci formed an agreement to defraud the Limited Partnership and Pavicich and such other investors in the Limited Partnership by keeping from them the material facts regarding Ferrito and Feldman's claims and the probability of suit, as alleged above. [¶] . . . As a result of such conspiracy among defendants, and each of them, the Limited Partnership have [sic] suffered actual damages in an amount to be proven at trial. [¶] . . . Defendant Wallace, defendant Keller, and defendant Santucci are jointly and severally liable for all damages arising from the conspiracies."

In the cross-complaint, the conspiracy allegations are the same, except that the cross-complainants are the Corporation and Pavicich.

Santucci demurred to the complaint and cross-complaint. Among other things, he alleged that respondents failed to obtain the trial court's determination of merit, under section 1714.10, concerning their claim against him for conspiracy. As to this point, the trial court overruled Santucci's demurrer. Specifically, the trial court found that section 1714.10 was inapplicable.

Respondents subsequently amended their complaint and cross-complaint. Santucci demurred to the amended complaint and first amended cross-complaint. In this demurrer, Santucci again included the charge that respondents' conspiracy cause of action did not comply with the requirements of section 1714.10. Again, the trial court found that section 1714.10 was inapplicable.

Santucci appeals from the overruling of his demurrer to the complaint and cross-complaint, and also appeals again from the overruling of his demurrer as to the amended complaint and amended cross-complaint.[3] We consolidated the appeals and consider them together now.[4]

### Standard of Review

A general demurrer presents the same question to the appellate court as to the trial court: whether the plaintiff has alleged sufficient facts in the complaint to justify relief on any legal theory. (*B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 952-953 [230 Cal.Rptr. 192].) "The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. . . . The court does not, however, assume the truth of contentions, deductions or conclusions of law. . . . The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. . . .' . . . However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. . . . And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967 [9 Cal.Rptr.2d 92, 831 P.2d 317], citations omitted.) We review the material allegations of the pleadings in light of these principles.

---

[3]Santucci was entirely within his rights to demur to the fifth cause of action of the first amended complaint and amended cross-complaint notwithstanding his prior unsuccessful efforts to demur to the fifth cause of action of the original complaint and cross-complaint. (See, e.g., *Pacific States Enterprises, Inc. v. City of Coachella* (1993) 13 Cal.App.4th 1414, 1420, fn. 3 [17 Cal.Rptr.2d 68]; *Ion Equipment Corp. v. Nelson* (1980) 110 Cal.App.3d 868, 877 [168 Cal.Rptr. 361].)

[4]Although Santucci has appealed from the overruling of the demurrer to the complaint and cross-complaint, as well as the overruling of the demurrer to the amended complaint and amended cross-complaint, we review the issue according to the allegations of the amended pleadings. Our conclusion that the trial court properly overruled the demurrers to the amended pleadings makes moot Santucci's appeal from the overruling of his demurrers to the complaint and cross-complaint. Further, the matter is appealable under section 1714.10, subdivision (d).

## Discussion

According to Santucci, section 1714.10 applies to respondents' conspiracy causes of action. After carefully examining section 1714.10 and its legislative history, we conclude that the statute is inapplicable.

### A. Statutory Language

Section 1714.10 provides, in pertinent part, "No cause of action *against an attorney for a civil conspiracy with his or her client arising from any attempt to contest or compromise a claim or dispute, and which is based upon the attorney's representation of the client,* shall be included in a complaint or other pleading unless the court enters an order allowing the pleading that includes the claim for civil conspiracy to be filed after the court determines that the party seeking to file the pleading has established that there is a reasonable probability that the party will prevail in the action." (Italics added.)

Subdivision (c ) of section 1714.10 provides: "This section shall not apply to a cause of action against an attorney for a civil conspiracy with his or her client, where (1) the attorney has an independent legal duty to the plaintiff, or (2) the attorney's acts go beyond the performance of a professional duty to serve the client and involve a conspiracy to· violate a legal duty in furtherance of the attorney's financial gain."

### B. Legislative History

Section 1714.10 had its genesis in *Wolfrich Corp. v. United Services Automobile Assn.* (1983) 149 Cal.App.3d 1206 [197 Cal.Rptr. 446] (*Wolfrich*). In *Wolfrich*, an insured sued an insurance company and the attorneys representing the insurance company. According to the insured, the insurer and its attorneys had conspired to violate section 790.03 of the Insurance Code. The appellate court held that the attorneys were not in the insurance business and could not be sued for violating the Insurance Code but could be sued for conspiring with their clients to violate the Insurance Code.

In an effort to limit the holding in *Wolfrich*, the Legislature in 1988 enacted section 1714.10. (*Hung v. Wang* (1992) 8 Cal.App.4th 908, 919-920 [11 Cal.Rptr.2d 113]; *Westamco Investment Co. v. Lee* (1999) 69 Cal.App.4th 481, 484 [81 Cal.Rptr.2d 634].) Former section 1714.10 narrowed *Wolfrich* by protecting against frivolous conspiracy claims brought against attorneys and their clients. The statute achieved this goal by requiring a prefiling judicial determination of a reasonable probability that the conspiracy claim

was meritorious. "Both houses of the Legislature expressed concern over use of such claims as a tactical ploy, particularly in actions against insurance companies." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 718 [34 Cal.Rptr.2d 898, 882 P.2d 894].)

As originally enacted in 1988, section 1714.10, provided, in pertinent part, that "No cause of action against an attorney based upon a civil conspiracy with his or her client shall be included in a complaint or other pleading unless the court enters an order allowing the pleading that includes a claim for civil conspiracy to be filed after the court determines that the party seeking to file the pleading has established that there is a reasonable probability that the party will prevail in the action. . . ." (Stats. 1988, ch. 1052, § 1, pp. 3407-3408.)

In 1989, in *Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39 [260 Cal.Rptr. 183, 775 P.2d 508] (*Doctors' Co.*), the California Supreme Court considered the issue presented in *Wolfrich.* In *Doctors' Co.*, a third party claimant sued an insurer, the attorney retained by the insurer to assist in the defense of the insured against the third party claim, and the insurer's expert witness. The third party claimant alleged a conspiracy to violate Insurance Code section 790.03, subdivision (h)(5).

In *Doctors' Co.*, the California Supreme Court decided that the demurrers to the conspiracy cause of action should have been sustained. According to the court, the duty to refrain from violating Insurance Code section 790.03, subdivision (h)(5) was imposed only upon those engaged in the business of insurance. (*Doctors' Co.*, *supra*, 49 Cal.3d at p. 44.) Because the complaint did not allege that the attorneys or expert was engaged in the insurance business, the attorney and expert defendants were not bound by section 790.03, subdivision (h)(5). In reaching its decision, the court articulated the basic rule that a conspiracy cause of action cannot lie "if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing and was acting only as the agent or employee of the party who did have that duty." (49 Cal.3d at p. 44.) *Doctors' Co.* held that the attorney and expert defendants were not subject to the duty under the Insurance Code, and were acting merely as agents of the insurer, and "not as individuals for their individual advantage," and therefore they could not be liable for conspiracy. *Doctors' Co.* expressly overruled *Wolfrich* and held that *Wolfrich* was incorrectly decided.

*Doctors' Co.* also explained that in some circumstances, attorneys could be liable for participating in tortious acts with their clients, and that the

liability could be based upon conspiracy. For example, when the attorney acts as an individual for his or her individual gain, conspiracy liability may be imposed. As the court stated, "an attorney who conspires to cause a client to violate a statutory duty peculiar to the client may be acting not only in the performance of a professional duty to serve the client but also in furtherance of the attorney's own financial gain." (*Doctors' Co., supra*, 49 Cal.3d at p. 46.)

Another situation in which attorneys could be liable for conspiring with their clients is when the attorney violates "the attorney's own duty to the plaintiff." (*Doctors' Co., supra*, 49 Cal.3d at p. 47.) *Doctors' Co.* cited *Barney v. Aetna Casualty & Surety Co.* (1986) 185 Cal.App.3d 966 [230 Cal.Rptr. 215] as an example. In *Barney*, "the car driven by the plaintiff insured had collided with another car. The insurer retained attorneys to defend the insured against a municipal court action by the driver of the other car, and the insured, through separate counsel, sued the other driver in superior court. Without notice to the insured, the insurer-retained attorneys settled the other driver's claim and filed a dismissal with prejudice of the municipal court action; the dismissal operated as a retraxit barring the insured's superior court action. The insured's conspiracy cause of action against the insurer and the attorneys who had arranged the settlement was upheld since the settlement clearly violated the attorney's fiduciary duty to the insured plaintiff." (*Doctors' Co., supra*, 49 Cal.3d at p. 47.)

*Doctors' Co.* also cited *Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498 [169 Cal.Rptr. 478] as another example of a case in which attorneys were held liable for conspiring with their clients because the attorney had violated his or her own duty to the plaintiff. In *Younan*, "the plaintiff alleged a conspiracy among his insurer and two of the insurer's agents to deprive plaintiff of disability insurance benefits by falsely representing that plaintiff would be examined by a medical doctor who would objectively consider plaintiff's claim for benefits when in fact the examination was to be conducted by a psychiatrist who had agreed, by prearrangement with the insurer, to render a false report to provide a plausible excuse for denying the benefits. [Citation.] The agents were held subject to liability for conspiracy to commit *actual* fraud since they had a duty to abstain from injuring the plaintiff through express misrepresentation, independent of the insurer's implied covenant of good faith and fair dealing. [Citation.] But they were held not liable for *constructive* fraud since that charge rested on a fiduciary duty of disclosure which was owed plaintiff only by the insurer itself. [Citations.]" (*Doctors' Co., supra*, 49 Cal.3d at p. 48, italics in original.)

In 1991, two years after *Doctors' Co.* was decided, section 1714.10 was amended. Originally, the proposed amendment changed section 1714.10 so

that it only applied to *Wolfrich*-type conspiracy claims, that is, conspiracy allegations against attorneys and clients that were based upon the Insurance Code. The Legislature believed section 1714.10 was being used to bar at the pleading stage meritorious conspiracy claims involving attorneys. In particular, savings and loan cases were cited as an example of cases in which section 1714.10 had been improperly applied. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 820 (1991-1992 Reg. Sess.) May 7, 1991, p. 3.) Accordingly, the original version of the bill amended the statute to provide that "No cause of action against an attorney for a civil conspiracy with his or her client to violate subdivision (h) of Section 790.03 of the Insurance Code, and which is based upon the attorney's representation of the client . . . ." (Sen. Bill No. 820 (1991-1992 Reg. Sess.) as introduced Mar. 7, 1991.)

Further analysis, however, alerted the drafters to the decision in *Doctors' Co*. There then arose many debates about that case's impact upon section 1714.10. Initially, the bill's author commented that "[i]t is unknown whether there is a need for pleading hurdles to protect attorneys from the type of civil conspiracy claims permitted under the Doctors' Company rational [*sic*]." (Sen. Com. on Judiciary, com. on Sen. Bill No. 820 (1991-1992 Reg. Sess.) May 7, 1991, p. 4.) The bill's author also reasoned that "existing case law makes it impossible to sue anyone under Section 790.03, [therefore] the need for a pleading hurdle for actions against attorneys under that section has been effectively negated." (*Id.* at p. 3.)

Other analysis decided that the " 'pleading hurdle' should not apply in those civil conspiracy cases in which the Supreme Court has upheld the potential liability of an attorney. The 'pleading hurdle' should only apply in other cases, where the allegation of civil conspiracy is made for ulterior reasons, primarily to disrupt the attorney-client relationship." (Assem. Subcom. on the Administration of Justice, analysis of Sen. Bill No. 820 (1991-1992 Reg. Sess.) July 17, 1991, pp. 2-3.) The California Trial Lawyers Association, on the other hand, advocated repealing the statute, on the ground that it was moot.

Ultimately, it was decided that the statute should be amended to apply when an attorney engaged in a civil conspiracy with his or her client " 'arising from any attempt to contest or compromise a claim or dispute.' " It was also decided to except from the statute's scope the two situations detailed in *Doctors' Co*. The author of the proposed amendment stated that "This bill would limit [the statute] to civil conspiracies between an attorney and client arising from any attempt to contest or compromise a claim or dispute, and which involve the attorney's representation of the client, excluding causes of action where (1) the attorney has an independent legal duty

to the plaintiff, or (2) the attorney's acts go beyond the attorney's duties to the client, and involve conspiracy to violate a legal duty in furtherance of the attorney's financial gain." (Sen. Mike Thompson, letter to Governor Pete Wilson, Sept. 17, 1991.)

Accordingly, section 1714.10, subdivision (a) was amended to so provide. (Stats. 1991, ch. 916 (Sen. Bill No. 820) § 1, p. 4108.) Apart from minor changes, subdivisions (a) and (c) have not been subsequently altered.

## C. *Impact of History Upon Section 1714.10*

■ Armed with this background, we now consider section 1714.10's meaning. After careful consideration, we believe that no attorney-client conspiracy would be subject to the pleading hurdle described in section 1714.10. Specifically, it appears that the pleading hurdle would only apply to attorney/client conspiracy causes of action which are not viable in any event. In such circumstances, overcoming the pleading hurdle is the least of the plaintiff's worries.

In particular, *Doctors' Co.* stated the general rule that "A cause of action for civil conspiracy may not arise, however, if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing and was acting only as the agent or employee of the party who did have that duty." (*Doctors' Co., supra*, 49 Cal.3d at p. 44.) The *Doctors' Co.* decision was based, in part, upon the rule that "duly acting agents and employees cannot be held liable for conspiring with their own principals (the 'agent's immunity rule')." (*Applied Equipment Corp. v. Litton Saudia Arabia Ltd.* (1994) 7 Cal.4th 503, 512 [28 Cal.Rptr.2d 475, 869 P.2d 454].) Simply put, "under the agent's immunity rule, an agent is not liable for conspiring with the principal when the agent is acting in an official capacity on behalf of the principal." (*Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318, 1326 [58 Cal.Rptr.2d 308]; see also *Black v. Bank of America* (1994) 30 Cal.App.4th 1, 4 [35 Cal.Rptr.2d 725].[5]

Section 1714.10's procedural hurdle seems aimed at situations where the attorney is acting in his or her official capacity. This is indicated by the

---

[5]In *Doctors' Co.*, the court stated that "we anticipate that the impact of our holding, barring liability of employees or agents for conspiracy to cause their principal to violate a duty that is binding on the principal alone, will be relatively narrow where the violated duty is other than contractual. The duties imposed by section 790.03 are somewhat unusual in that their application is expressly restricted to 'persons engaged in the business of insurance' [citation]." (*Doctors' Co., supra*, 49 Cal.3d at p. 48.) This comment cannot be viewed as weakening the agent's immunity rule. In fact, in *Applied Equipment*, the Supreme Court

statute's legislative history and the Legislature's concern with conspiracy actions designed to "disrupt" the attorney/client relationship. It is also demonstrated by section 1714's words. In particular, section 1714.10, subdivision (a) refers to actions against an attorney for conspiring with his or her client that arise from "attempt[s] to contest or compromise a claim" and that are "based upon the attorney's representation of the client."

Yet when an attorney is acting in his or her official capacity, there are only the situations articulated in *Doctors' Co.*, in which an attorney could be liable for conspiring with his or her client. Of course, these situations are specifically excepted from section 1714.10's scope.

To be sure, an attorney, acting in the scope of his or her official duties, and not for individual gain, can be liable to third parties in certain circumstances. But those circumstances will always require that the attorney have a duty to the third party. For example, if an attorney commits actual fraud in his dealings with third parties, the fact that he did so in the capacity of attorney does not relieve him of liability. (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 345 [134 Cal.Rptr. 375, 556 P.2d 737]; *Greenwood v. Mooradian* (1955) 137 Cal.App.2d 532, 539 [290 P.2d 955].) Similarly, where an "attorney gives his client a written opinion with the intention that it be transmitted to and relied upon by the plaintiff in dealing with the client[,] . . . the attorney owes the plaintiff a duty of care in providing the advice because the plaintiff's anticipated reliance upon it is 'the end aim of the transaction.' (*Glanzer* v. *Shepard* (1922) 233 N.Y. 236, 238-239 [135 N.E. 275].)" (*Goodman v. Kennedy, supra*, 18 Cal.3d 335, 343, fn. 1, citing *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104, 111 [128 Cal.Rptr. 901].)

Basically, the problem with section 1714.10 is that it excludes from its scope what is essentially an element of a conspiracy cause of action. As noted in *Applied Equipment*, "tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, i.e., *that he or she owes a duty to plaintiff recognized by law* and is potentially subject to liability for breach of that duty." (*Applied Equipment Corp. v. Litton Saudia Arabia Ltd., supra*, 7 Cal.4th at p. 511, italics added.)

In *Applied Equipment*, the California Supreme Court further explained that "Conspiracy is not an independent tort; it cannot create a duty or abrogate an immunity. It allows tort recovery only against a party who already owes the duty and is not immune from liability based upon applicable substantive tort

reconfirmed the validity of that rule. (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra*, 7 Cal.4th at p. 512, fn. 4.)

law principles." (*Applied Equipment Corp. v. Litton Saudi Arabia, Ltd., supra*, 7 Cal.4th at p. 514.) Section 1714.10, subdivision (c) reflects these basic concepts by not applying the statute's procedural hurdle to situations where the attorney has a duty to the plaintiff, or to situations where the attorney acts not merely as an agent but as an individual in furtherance of the attorney's financial gain. In so doing, section 1714.10 exempts viable conspiracy actions against an attorney and his or her client from its procedural hurdle.

The problem may be due to the use of the phrase "*independent* duty" in *Doctors' Co.*, as if the word "independent" changes on some level the basic fact that conspiracy law allows tort recovery "only against a party who already owes the duty and is not immune from liability based on applicable substantive tort law principles." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra*, 7 Cal.4th at p. 514.) It does not.

Most of the cases discussing section 1714.10 do not assist our analysis because they deal with the pre-1991 version of the statute. (See *Pierce v. Lyman* (1991) 1 Cal.App.4th 1093 [3 Cal.Rptr.2d 236]; *Villa Pacific Building Co. v. Superior Court* (1991) 233 Cal.App.3d 8 [284 Cal.Rptr. 227]; *Hung v. Wang, supra*, 8 Cal.App.4th 908; *Howard v. Superior Court* (1992) 2 Cal.App.4th 745 [3 Cal.Rptr.2d 575].) Cases dealing with the current version of section 1714.10 do not discuss its legislative history or the holding in *Doctors' Co.*, or else deal with different aspects of the statute. (See *Evans v. Pillsbury, Madison & Sutro* (1998) 65 Cal.App.4th 599 [76 Cal.Rptr.2d 679]; *Castro v. Higaki* (1994) 31 Cal.App.4th 350 [37 Cal.Rptr.2d 84]; *Westamco Investment Co. v. Lee* (1999) 69 Cal.App.4th 481 [81 Cal.Rptr.2d 634].)

In sum, given the rules of the law of conspiracy, the wording of section 1714.10, and its legislative history, it appears that there are no viable conspiracy actions to which section 1714.10's pleading hurdle might apply.

### D. *Applicability of Section 1714.10, Subdivision (c) to Facts*

■■ Although framed in the context of invoking section 1714.10, subdivision (a), Santucci's demurrer, by arguing that section 1714.10, subdivision (c) does not apply, in effect challenges whether respondents' pleadings state a cause of action against Santucci for conspiring with his client, Keller. (See *B & P Development Corp. v. City of Saratoga, supra*, 185 Cal.App.3d 949, 959.) As we will explain, it is clear that respondents' conspiracy claims against Santucci meet the requirements of section 1714.10, subdivision (c) and consequently meet the requirements for stating a cause of action against an attorney for conspiring with his or her client.

### 1. *Pavicich*

Pavicich can state a cause of action against Santucci for conspiring with Keller because Santucci had a duty to Pavicich to not commit fraud.[6]

Specifically, in the pleadings, it is alleged that the conspiracy occurred "at or prior to the time Pavicich and other investors each first had communications with any of the defendants regarding the brewpub project."[7] That time was late 1991 and early 1992. The relevant time is before February 6, 1992, which was the date when Pavicich agreed to purchase two limited partnerships and one-third the total shares in the Corporation.

In the pleadings, there is no allegation that Santucci was acting in any capacity other than as attorney for Keller individually, the Corporation, and the Limited Partnership. There is nothing in the pleadings to indicate that Santucci was acting as an individual for individual gain. Pavicich, at the pertinent time, was a potential investor.

Our review of the pleadings discloses that Santucci did have a duty to Pavicich. In particular, Santucci had a duty to abstain from injuring Pavicich through express misrepresentation. (*Goodman v. Kennedy, supra*, 18 Cal.3d at p. 345; *Younan v. Equifax Inc., supra*, 111 Cal.App.3d at p. 511.) The pleadings indicate that Santucci violated this duty because they allege that, prior to investing, Pavicich met with Santucci, Wallace, and Keller, in Santucci's office. Pavicich asked if there was anything he should know about the early stages of the brew pub project. Santucci and Keller replied that there had been negotiations with "two Los Gatos businessmen" but that those negotiations had not been fruitful. Santucci also stated that *to avoid any problems or future claims*, Keller, Earle and the "two businessmen" executed a legally binding release agreement.

Thus, the pleadings allege a misrepresentation since in fact the Release had not avoided any future problems or claims. Specifically, Santucci did not reveal that Ferrito and Feldman had sent several letters to Santucci, Wallace, and Keller, did not reveal that in the letters Feldman/Ferrito claimed the Release was procured by fraud, did not reveal that in the letters Feldman/Ferrito threatened litigation over the Release, but instead indicated

---

[6]The pleadings allege that Santucci conspired with Keller and Wallace. However, Wallace was not Santucci's client; only Keller was and so we need not address the viability of respondents' conspiracy claims against Wallace.

[7]Under the conspiracy cause of action, the pleadings state that the conspiracy "at or prior to the time Pavicich and other investors each first had communications with any of the defendants regarding the brewpub project." Since that is when it is alleged that the conspiracy started, we will focus upon that time.

that the existence of the Release would prevent any future problems despite the fact that, in reality, the Release was already the subject of dispute and threatened litigation.

This is not a situation where we are required to apply the rule that a "duty to disclose a material fact normally arises only where there exits a confidential relation between the parties or other special circumstances require disclosure. . . ." (*Cicone v. URS Corp.* (1986) 183 Cal.App.3d 194, 201 [227 Cal.Rptr. 887].) This is because of the principle that "where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated. [Citation.] One who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud." (*Ibid.*; see also *Charpentier v. Los Angeles Rams Football Co.* (1999) 75 Cal.App.4th 301, 312 [89 Cal.Rptr.2d 115].)

Accordingly, Pavicich can state a cause of action against Santucci for conspiring with Keller.

2. *Corporation/Limited Partnership*

The Corporation and the Limited Partnership can also state a claim against Santucci for conspiring with Keller. This is because Santucci had a fiduciary duty to both the Corporation and Limited Partnership.

Specifically, Santucci was acting as an attorney for the Corporation and Limited Partnership. Consequently, Santucci had a fiduciary duty to the Corporation and Limited Partnership. ■ It is settled that " '[t]he relation between attorney and client is a fiduciary relation of the very highest character and binds the attorney to most conscientious fidelity—*uberrima fides.*'" (1 Witkin, Cal. Procedure (4th ed. 1996) Attorneys, § 118, p. 155, quoting *Cox v. Delmas* (1893) 99 Cal. 104, 123 [33 P. 836].)

■ The pleadings allege that Santucci violated his fiduciary duty to the Corporation and Limited Partnership because he did not attempt to resolve the Ferrito/Feldman claims, but ignored those claims, and tried to conceal them from potential investors, thereby exposing the Corporation and Limited Partnership to harm in the form of settlement and defense costs resulting from the Feldman/Ferrito claims. Viewing the pleadings liberally, as we must, these allegations suffice and the Corporation and Limited Partnership can state a claim against Santucci for conspiring with Keller.

In sum, respondents' pleadings state a cause of action against Santucci for conspiring with Keller. Consequently, the trial court did not err in overruling Santucci's demurrers to respondents' pleadings.

## *Disposition*

The judgment is affirmed.

Cottle, P. J., and Mihara, J., concurred.