[No. A113902. First Dist., Div. One. Nov. 28, 2007.]

NICHOLAS PANOUTSOPOULOS et al., Plaintiffs and Respondents, v. DENISE CHAMBLISS et al., Defendants and Appellants.

**COUNSEL**

Hassard Bonnington, Philip S. Ward and Joanna Storey for Defendants and Appellants.

Law Offices of Nick T. Reckas and Nick T. Reckas for Plaintiffs and Respondents.

**OPINION**

**STEIN, J.**—Plaintiffs Nicholas and Ekaterine Panoutsopoulos, who own and operate a restaurant on property leased from the Karsant Family Limited Partnership (the partnership), filed a complaint against the partnership's general manager, Peter Karsant. Plaintiffs later filed a petition under Civil Code section 1714.10,[1] seeking leave to pursue causes of action for civil conspiracy between Karsant and his attorneys, Denise Chambliss, Susan Doyle and the Law Offices of Doyle & Associates (the attorneys). The trial court granted the petition, and the attorneys appeal.[2] We reverse.

## BACKGROUND

In 1988, plaintiffs entered into an agreement with George and Mary Karsant, under which plaintiffs agreed to lease a portion of a building for the purpose of installing and operating a restaurant. The lease was for a term of 123 months, with options allowing them to extend the lease for two 60-month periods. George Karsant died in 1993. In 1996, Mary Karsant and her children formed the partnership. Mary Karsant assigned to it her right, title and interest in the leasehold. Mary Karsant managed the partnership until 2002, when her son, Peter Karsant (Karsant), who by then apparently had taken on most of the managing duties, formally became the managing general partner. According to plaintiffs' original complaint, Karsant "devised and carried out a persistent and protracted scheme of harassment and effort designed to force plaintiffs either to vacate their restaurant or to renegotiate a new addendum to their lease doubling their rent from $10,000 per month . . . to $21,320 per month."

The alleged scheme involved a series of complaints and claims emanating from Karsant that plaintiffs had breached or were breaching the lease. The complaints and claims often were accompanied by threats to terminate the lease. The alleged scheme began in 1999, when Karsant demanded plaintiffs

---

[1] All further statutory references are to the Civil Code.

[2] The order granting the petition is made appealable by section 1714.10, subdivision (d).

pay taxes retroactive to the beginning of the lease even though, according to plaintiffs, George and Mary Karsant had agreed they would not be required to pay property taxes and it was undisputed no one previously had attempted to collect property taxes from them. Plaintiffs settled the claim, paying $7,427.69, under an agreement reciting this sum brought their "rent current."[3] In the summer of 2002, Karsant claimed plaintiffs wrongfully had appropriated a room, which they had converted and were using to store wine. He threatened to terminate the lease if plaintiffs did not vacate the room by July 15, 2002. Plaintiffs vacated the room, but Karsant nonetheless insisted they had breached the lease because they had not completely removed a drainpipe that had been attached to a dessert case. Karsant claimed he therefore was entitled to terminate the lease. Plaintiffs presumably removed the drain.

In December 2002, despite the earlier agreement that plaintiffs had brought their "rent current," Karsant informed plaintiffs they owed $21,099.67 in unpaid insurance premiums and threatened to terminate the lease if they did not pay. Plaintiffs did not believe they owed the money, but agreed to pay it in three installments beginning in January 2003. Plaintiffs sent a letter to Karsant in December 2002, confirming the first payment would be made on January 15, 2003. Karsant took the position plaintiffs were required to make the first payment on January 1, accused them of choosing not to abide by their agreement, asserted the entire $21,099.67 therefore was immediately due and threatened to terminate the lease if they did not pay. Plaintiffs paid.

By this time, the attorneys were representing Karsant. In July 2003, the attorneys wrote a letter to plaintiffs reporting plaintiffs had committed 10 uncured and in some cases uncurable defaults and breaches of the lease related to repairs plaintiffs were having done on the restaurant floor. The attorneys did not respond to a request from plaintiffs' contractor asking for more information about the alleged breaches. The attorneys instead wrote to plaintiffs that, on information and belief, plaintiffs had failed to remedy the violations identified in the earlier letter. The attorneys wrote, further, it was their impression plaintiffs had abandoned all efforts to comply with an obligation to obtain the landlord's prior written consent and/or provide plans and specifications showing the work they intended to have done.[4] Karsant hand delivered the attorneys' letter, along with a "fifth addendum" to the lease, which essentially raised the rent to $21,320 per month. A few days

---

[3] Karsant was represented in this matter by Patricia Andersson, who is not a party to this appeal.

[4] Plaintiffs had received a notice from the health department that repairs were needed to the kitchen and dishwashing room floor. They contracted to have the floor retiled. Karsant apparently took the position that the work fell under section 8.01 of the lease, which requires the tenant to obtain the landlord's consent to "installations, additions, or improvements in or to the Premises or structural alterations or changes either to the interior or exterior of the building . . . or in the bearing walls, supports, beams, or foundations."

later, Karsant delivered his own letter asserting plaintiffs were breaching the lease by leaving a fire exit door open, telling plaintiffs their failure to heed repeated warnings to keep the door closed and keep the area free from debris proved the breach to be incurable. Karsant demanded plaintiffs cease further operations and deliver the keys to the premises to him within three days.

In September 2003, an off-duty employee damaged the exterior of the building by running into it with her car. Karsant had his contractor inspect the damage and prepare a cost estimate. Plaintiffs signed off on the estimate, but wrote to Karsant and the attorneys that they did not wish to get involved with the exterior repairs, pointing out the contractor had reached an agreement with Karsant, and plaintiffs had no say in the repair work. The attorneys responded with a three-day notice to perform or quit, taking the position plaintiffs were responsible for overseeing the work. Plaintiffs agreed to oversee the work, and sent authorization to Karsant's contractor and to the attorneys to have the work done. The contractor, however, reported he was busy with other work. When the work was not done, the attorneys served another three-day notice to perform or quit, complaining the repairs had not been effected. The attorneys also complained plaintiffs had failed to install fresh-air intake vents.[5] Plaintiffs explained the situation to the attorneys and it appears the matter was dropped, temporarily. In April 2004, the contractor informed plaintiffs he would do the work in May 2004, but stated it would cost $4,500 over his original estimate of $21,750. Plaintiffs sent the revised estimate to the insurance company for approval. The insurance company responded by sending out its own adjuster and contractor, who estimated the job would cost only $8,000. Ultimately, Karsant and plaintiffs agreed the insurance company's contractor could do the repairs. Karsant then apparently sought to take over and oversee the exterior repairs and the installation of the air vents.

Plaintiffs further claimed that in August 2004, Karsant and the attorneys had attempted to persuade Clay Hogan of the San Francisco Plumbing Company to exaggerate the severity of a problem with the building's sewer system and falsely report plaintiffs were the sole cause of the problem. Mr. Hogan refused.

In the meantime in March 2004, as permitted by the lease, plaintiffs filed a petition to arbitrate claims of breach of the covenant of quiet enjoyment and intentional infliction of emotional distress, naming the partnership and Karsant as respondents. Karsant opposed the petition, claiming he was not bound by the lease's arbitration provision. Plaintiffs agreed to dismiss the

---

[5] It seems that the air vents were something Karsant wanted, were not required by the City of San Francisco, and therefore were not plaintiffs' responsibility.

petition as to Karsant without prejudice. Plaintiffs' claims against the partnership were arbitrated by the Honorable David A. Garcia, retired judge of the San Francisco Superior Court, who, in a March 24, 2005 decision, awarded plaintiffs compensatory damages of $21,999.67, representing the sum paid for insurance, plus various forms of declaratory and injunctive relief. Judge Garcia also found Karsant, as managing general partner, intentionally had inflicted emotional distress on plaintiffs, engaging in outrageous conduct. Judge Garcia therefore also awarded $10,000 to Nicholas Panoutsopoulos and ordered Karsant to pay $100,000 in punitive damages. Plaintiffs also were awarded attorney fees and costs.

In the meantime, on May 14, 2004, plaintiffs filed their original complaint against Karsant and 10 Doe defendants. Plaintiffs later filed a case management statement indicating an intention to join the attorneys as additional defendants to the complaint, and in February 2005, plaintiffs filed a motion seeking leave to file an amended complaint to include claims of civil conspiracy. The court denied the motion without prejudice, ruling it did not comply with section 1714.10, which requires a party seeking to bring an action against an attorney for civil conspiracy with his or her client, to obtain a court order allowing the party to file the pleading.

Plaintiffs then filed a petition to join the attorneys as defendants, arguing section 1714.10 did not bar them from seeking relief against the attorneys on claims of civil conspiracy to defraud, willful interference with quiet possession of business premises and intentional infliction of severe emotional distress, and again seeking leave to file an amended complaint. The court granted plaintiffs' petition.

This appeal followed.

DISCUSSION

I.

Section 1714.10

Subdivision (a) of section 1714.10 provides, in relevant part: "No cause of action against an attorney for a civil conspiracy with his or her client arising from any attempt to contest or compromise a claim or dispute, and which is based upon the attorney's representation of the client, shall be included in a complaint or other pleading unless the court enters an order allowing the pleading that includes the claim for civil conspiracy to be filed after the court determines that the party seeking to file the pleading has established that there is a reasonable probability that the party will prevail in the action. The

court may allow the filing of a pleading claiming liability based upon such a civil conspiracy following the filing of a verified petition therefor accompanied by the proposed pleading and supporting affidavits stating the facts upon which the liability is based." Subdivision (b) of section 1714.10 provides, in part, "Failure to obtain a court order where required by subdivision (a) shall be a defense to any action for civil conspiracy filed in violation thereof." Section 1714.10, subdivision (c) excepts from the reach of the section "a cause of action against an attorney for a civil conspiracy with his or her client, where (1) the attorney has an independent legal duty to the plaintiff, or (2) the attorney's acts go beyond the performance of a professional duty to serve the client and involve a conspiracy to violate a legal duty in furtherance of the attorney's financial gain."

■   The Sixth District in *Pavicich v. Santucci* (2000) 85 Cal.App.4th 382 [102 Cal.Rptr.2d 125] (*Pavicich*), in a detailed and thoughtful discussion, concluded the exceptions in section 1714.10, subdivision (c) have the effect of exempting any viable attorney-client conspiracy claims from section 1714.10's requirements. The court later stated in *Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.* (2005) 131 Cal.App.4th 802, 818 [32 Cal.Rptr.3d 325] (*Berg*), "As we observed in *Pavicich*, the effect of [the 1991 amendment to section 1714.10] is anomalous. Since the statute now removes from its scope the two circumstances in which a valid attorney-client conspiracy claim may be asserted, its gatekeeping function applies only to attorney-client conspiracy claims that are not viable as a matter of law in any event. [Citing *Pavicich, supra,* at pp. 394–396.] Thus, a plaintiff who can plead a viable claim for conspiracy against an attorney need not follow the petition procedure outlined in the statute as such a claim necessarily falls within the stated exceptions to its application."

■   This conclusion arises from two legal principles and their impact on the development of section 1714.10. A conspiracy cause of action cannot lie "if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing and was acting only as the agent or employee of the party who did have that duty." (*Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39, 44 [260 Cal.Rptr. 183, 775 P.2d 508] (*Doctors' Co.*).) In *Doctors' Co.,* for example, the court reasoned an attorney and an expert witness could not be held liable for a conspiracy to violate Insurance Code section 790.03, subdivision (h)(5), because that section imposes a duty only upon persons in the insurance business. (*Doctors' Co.,* at p. 46.) Moreover, " 'under the agent's immunity rule, an agent is not liable for conspiring with the principal when the agent is acting in an official capacity on behalf of the principal.' [Citations.]" (*Pavicich, supra,* 85 Cal.App.4th at p. 394.) It follows that the only viable claims for an attorney's civil conspiracy with a client are claims that an attorney, conspiring to cause a client to violate a statutory duty peculiar to the

client, acted not only in the performance of a professional duty to serve the client but also in furtherance of the attorney's financial gain (*Doctors' Co., supra*, at p. 46), or claims that the attorney violated the attorney's own duty to the plaintiff (*id.* at p. 47).

The Sixth District, in *Pavicich,* reviewed the history of section 1714.10, and in particular the inclusion of the two exceptions as a means of exempting from the statute's scope the situations described in *Doctors' Co., supra,* 49 Cal.3d 39. The *Pavicich* court reasoned, "Section 1714.10's procedural hurdle seems aimed at situations where the attorney is acting in his or her official capacity. This is indicated by the statute's legislative history and the Legislature's concern with conspiracy actions designed to 'disrupt' the attorney/client relationship. It is also demonstrated by section [1714.10's] words. In particular, section 1714.10, subdivision (a) refers to actions against an attorney for conspiring with his or her client that arise from 'attempt[s] to contest or compromise a claim' and that are 'based upon the attorney's representation of the client.' [¶] Yet when an attorney is acting in his or her official capacity, there are only the situations articulated in *Doctors' Co.,* in which an attorney could be liable for conspiring with his or her client. Of course, these situations are specifically excepted from section 1714.10's scope. [¶] To be sure, an attorney, acting in the scope of his or her official duties, and not for individual gain, can be liable to third parties in certain circumstances. But those circumstances will always require that the attorney have a duty to the third party. For example, if an attorney commits actual fraud in his dealings with third parties, the fact that he did so in the capacity of attorney does not relieve him of liability. [Citations.] Similarly, where an 'attorney gives his client a written opinion with the intention that it be transmitted to and relied upon by the plaintiff in dealing with the client[,] . . . the attorney owes the plaintiff a duty of care in providing the advice because the plaintiff's anticipated reliance upon it is "the end aim of the transaction." [Citation.]' [Citation.]" (*Pavicich, supra,* 85 Cal.App.4th at pp. 394–395.)

In *Berg,* the Sixth District took its analysis one step further, reasoning, "Applying section 1714.10 thus requires the court to initially determine whether the pleading falls either within the coverage of the statute or, instead, within one of its stated exceptions. This determination pivots, in turn, on whether the proposed pleading states a viable claim for conspiracy against the attorney. [Citation.] For all intents and purposes, this is the determinative question. If such a claim is stated, the analysis ends before reaching evidentiary considerations; the statute does not apply because the claim necessarily falls under one of its exceptions. If it is not stated, the analysis likewise ends, but with the opposite result; the pleading is disallowed for its failure to meet the initial gatekeeping hurdle of the statute." (*Berg, supra,* 131 Cal.App.4th at p. 818.)

## II.

### Application of Section 1714.10 to This Case

■ One type of claim excepted from section 1714.10 is a claim arising from alleged actions by the attorney going "beyond the performance of a professional duty to serve the client [involving] a conspiracy to violate a legal duty in furtherance of the attorney's financial gain." (§ 1714.10, subd. (c).) The court in *Berg* analyzed this exception, concluding "it means that the attorney was acting not merely as an agent for his or her client, but also for his or her own benefit, and that the conduct therefore went 'beyond' the representative role." (*Berg, supra*, 131 Cal.App.4th at p. 833.) In addition, the court found the requirement that the acts were taken in furtherance of the attorney's own financial advantage should be interpreted to mean "a personal advantage or gain that is over and above ordinary professional fees earned as compensation for performance of the agency [i.e., the attorney's representation of the client]." (*Id.* at p. 834.) Here, nothing in plaintiffs' pleadings or affidavits suggests the attorneys were acting for their own benefit, as opposed to seeking an advantage for their client, or that they expected their actions to result in a financial advantage over and above the fees they were earning for representing their client. We conclude, therefore, that plaintiffs have not stated a viable claim under this exception. It follows they can go forward against the attorneys only if they can state a viable claim based on some independent duty owed to them by the attorneys.

Plaintiffs' claims relating to the breach of the covenant of quiet enjoyment arise out of their lease with the partnership. (See *Andrews v. Mobile Aire Estates* (2005) 125 Cal.App.4th 578, 588–589 [22 Cal.Rptr.3d 832]; § 1927.) The attorneys were not party to the lease and therefore owe plaintiffs no duty arising from it. It follows plaintiffs cannot state a viable claim against the attorneys for breach of the covenant.

■ An attorney may be held liable for conspiring with his or her client to commit actual fraud or for the intentional infliction of emotional distress. (*Doctors' Co., supra*, 49 Cal.3d at p. 48; *Pavicich, supra*, 85 Cal.App.4th at pp. 395, 397–398; *Younan v. Equifax, Inc.* (1980) 111 Cal.App.3d 498, 512–513, 515–516 [169 Cal.Rptr. 478] (*Younan*).) But plaintiffs can state a viable claim only if the attorneys' actions went beyond their role as attorneys acting on behalf of Karsant or the partnership. With but one exception, plaintiffs have not satisfied this requirement, distinguishing this case from those where it was found the plaintiffs had stated viable conspiracy claims.

In *Barney v. Aetna Casualty & Surety Co.* (1986) 185 Cal.App.3d 966 [230 Cal.Rptr. 215], the plaintiff was injured in an automobile accident, and filed a claim with her insurance company, asserting the other party to the accident, Yoakum, was at fault. The insurance company hired attorneys to defend the plaintiff in an action brought against her by Yoakum, and the attorneys ultimately settled that action, obtaining a dismissal with prejudice that acted as a retraxit barring the plaintiff from pursuing her claims against Yoakum. (*Id.* at pp. 970–971.) The court found these facts indicated the attorneys had breached an independent duty owed to the plaintiff, pointing out "[a]n insurance defense attorney who carries out and [consummates] a bad faith settlement agreement effected by the insurer violates the fiduciary duty he owes to his other client, the insured." (*Id.* at p. 982.) Similarly, a misrepresentation made by an attorney in order to induce the plaintiff to enter into a relationship with the attorney's client may be actionable because in such a case the attorney may owe a duty not just to his client, but to the plaintiff. (*Pavicich, supra,* 85 Cal.App.4th at p. 395.) In *Pavicich,* for example, the plaintiff alleged that to induce the plaintiff to invest in a joint venture, an attorney misrepresented that early negotiations with third parties had resulted in a release that would avoid any problems or future claims, when the attorney knew the release already was the subject of dispute and threatened litigation. (*Id.* at pp. 397–398.) The attorney in *Pavicich* was purporting to give legal advice to the plaintiff to enable the plaintiff to decide whether or not to invest in the venture, and therefore owed the plaintiff an independent duty not to lie. The situation should be distinguished from that where an attorney asserts a questionable claim or defense against an adverse party, as those assertions are made in a representative capacity, and are made to persons to whom the attorney has no duty of full disclosure and who could not reasonably be expected to rely on the attorney's assertions. That an attorney, advocating on behalf of his or her client, overstates the client's rights or position violates no independent duty of care owed to the client's adversary.

In *Burtscher v. Burtscher* (1994) 26 Cal.App.4th 720 [31 Cal.Rptr.2d 682] (*Burtscher*), an attorney, although acting on behalf of her client, went far beyond her duties as an attorney, going to the plaintiff's home, calling a locksmith who opened the home, calling her cousin, a deputy sheriff, to oust a guest and personally taking possession of the plaintiff's personal belongings. The court found the attorney "resorted to self-help (with a little help from her cousin) in going onto the property and unilaterally retaking possession in circumstances where a lawyer would be serving a notice to quit, filing an unlawful detainer action and getting a court order. [The attorney] actively

participated in conduct that went way beyond the role of legal representative: self-help is not the practice of law." (*Id.* at p. 727.) In *Younan, supra,* 111 Cal.App.3d 498, the plaintiff had sought disability benefits under an insurance contract. The court found the plaintiff stated viable claims for conspiracy on allegations that the defendants, although the agents of the insurance company, had caused a clinical psychologist to examine the plaintiff and prepare a false report that would justify denying the plaintiff's claim. (*Id.* at p. 512.) The defendants' conduct, again, went beyond the assertion or prosecution of a claim as a representative. Their actions, therefore, were not merely the acts of an agent, and they therefore could be held liable despite the agents' immunity rule. In the present case, with the sole exception of the allegations that the attorneys attempted to induce the plumber, Clay Hogan, to misrepresent plaintiffs' responsibility for the drainage problems, all the letters, three-day notices and communications were sent in a representative capacity, stating or prosecuting the claims of Karsant and the partnership. That conduct is not actionable.

■ The allegations that the attorneys sought to induce Clay Hogan to misstate plaintiffs' responsibility for the sewer problems go beyond legal representation, falling into the same category as the allegations in *Younan, supra,* 111 Cal.App.3d 498, or *Burtscher, supra,* 26 Cal.App.4th 720. However, as the court in *Younan* recognized, to state a viable claim, it is not enough to claim a fraudulent act; the fraudulent act must have caused harm. "The causation aspect of actions for damage for fraud and deceit involves three distinct elements: (1) actual reliance, (2) damage resulting from such reliance, and (3) right to rely or justifiable reliance." (*Younan, supra,* at p. 513.) Here, plaintiffs have alleged only that the attorneys attempted to perpetrate a fraud. It is undisputed that this attempt resulted in no actionable harm, as Clay Hogan refused to alter his report and plaintiffs, therefore, did not in any way rely on the fraud.

■ In sum, plaintiffs have not stated viable claims against the attorneys. The pleading is disallowed for its failure to meet the initial gatekeeping hurdle of the statute (*Berg, supra,* 131 Cal.App.4th at p. 818), and there is no need to analyze the allegations and evidence further to determine if plaintiffs have shown a reasonable probability that they would prevail if allowed to go forward.

We find it unnecessary to consider whether the litigation privilege, section 47, subdivision (b)(2), provides further basis for reversal.

## CONCLUSION

The order granting plaintiffs' petition is reversed. The attorneys are awarded their appellate costs.

Marchiano, P. J., and Margulies, J., concurred.