[No. B151730. Second Dist., Div. One. Mar. 18, 2003.]

JOHN NORMAN SHAFER et al., Plaintiffs and Appellants, v. BERGER, KAHN, SHAFTON, MOSS, FIGLER, SIMON & GLADSTONE et al., Defendants and Respondents.

## COUNSEL

Hunt Ortmann Blasco Palffy & Rossell, Craig N. Rossell and Regan A. Molatore for Plaintiffs and Appellants.

Ropers, Majeski, Kohn & Bentley, Susan H. Handelman and Gregory K. Storey for Defendants and Respondents.

## OPINION

**MALLANO, J.**—This appeal presents the question of whether an attorney, who is retained by an insurance company to provide coverage advice in a lawsuit against its insured, may be held liable to the plaintiff in that lawsuit for making a fraudulent statement about coverage. We answer that question in the affirmative because deceit undermines the administration of justice.

I

BACKGROUND

For purposes of our review, we must accept as true the following allegations of the complaint. (See *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) With that in mind, we rarely use "alleged" in discussing the factual assertions in the complaint.

John and June Shafer are homeowners in Los Angeles County. In the early 1990's, they contracted with Tri-County Builders, a general contractor, to

remodel their home and build an addition to it. Tri-County Builders, a partnership, was run by Jay DeMay and Perry Hanstad. The construction contract apparently required that any disputes between the parties be resolved by binding arbitration before the American Arbitration Association (AAA).

As a result of numerous problems with the construction, in December 1991, the Shafers filed a demand for arbitration against Tri-County Builders, DeMay, and Hanstad. The demand set forth claims for breach of contract, negligence, fraud, and intentional infliction of emotional distress, among others, and sought an award of damages, including punitive damages. DeMay tendered the defense of the action to Truck Insurance Exchange, which had issued a comprehensive general liability policy to him doing business as Tri-County Builders.[1]

By letter dated May 18, 1992, Truck agreed to defend Tri-County Builders, DeMay, and Hanstad, subject to a reservation of rights. The letter consisted of four single-spaced pages that quoted and discussed several provisions in the insurance policy. It pointed out that coverage was dependent upon an "occurrence," which, according to the letter, was defined in the policy as "an event, or a series of events . . . which results during the policy period, in bodily injury or property damage, neither expected nor intended from the standpoint of the insured."

The letter continued: "[Y]our policy does not afford coverage for exemplary or punitive damages . . . . Additionally, intentional acts are not covered under any policy of insurance as provided under Insurance Code Section 533, as this is against public policy for insurers to provide coverage for such causes of action.[2] A definition of 'occurrence,' as well as Section 533 of the California Insurance Code and Section 1668 of the California

---

[1]The record includes references to both Truck Insurance Exchange and Farmers Insurance Group. The relationship between the two is not clear. For consistency, we refer to the insurance company as Truck.

[2]Section 533 of the Insurance Code states: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others." "A 'wilful act' under section 533 will include either 'an act deliberately done for the express purpose of causing damage or [an act] intentionally performed with knowledge that damage is highly probable or substantially certain to result.'" (*Mez Industries, Inc. v. Pacific Nat. Ins. Co.* (1999) 76 Cal.App.4th 856, 875-876 [90 Cal.Rptr.2d 721], italics omitted.)

Civil Code, may exclude coverage for damages resulting from such intentional and/or willful acts."[3]

In response to Truck's letter, DeMay requested that Truck pay for counsel of his own choosing. Because the Shafers' arbitration demand asserted claims of negligent and willful wrongdoing, DeMay was concerned that an attorney selected by Truck would have a conflict of interest given that a finding of liability based on *willful* acts would negate Truck's obligation to pay indemnity while a finding of *negligence* would entitle DeMay to indemnification. (See Civ. Code, § 2860; *San Diego Federal Credit Union v. Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494, 50 A.L.R.4th 913] (*Cumis*).)

For advice on coverage issues, Truck retained Lance LaBelle, Esq., of Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone. On June 9, 1992, LaBelle discussed coverage with Chris Lundblad, an employee of Truck. On June 11, 1992, LaBelle sent Lundblad a confirming letter, stating:

"This will confirm our telephone conference of June 9, 1992, wherein authority was extended for our office to modify Truck's May 18, 1992 reservation of rights [letter] with respect to the plaintiffs' claim as it relates to 'bodily injury' under the policy. Specifically, we discussed affording coverage for 'bodily injury,' i.e., physical manifestation of injury alleged in the complaint, which claim relates to both the intentional and negligence based causes of action in the complaint.

"[W]hile the vast majority of damages would not constitute 'property damage' under your policy . . . , we discussed the potential that resulting property damage to the flooring might constitute covered 'property damage' . . . . In an effort to modify the reservation of rights so as to not trigger the Cumis obligation . . . , we have enclosed the modified reservation of rights [letter] which we furnished to your insured pursuant to your authority. Please note that the definition of 'occurrence' has been deleted from the reservation of rights along with any reference to Insurance Code Section 533 and Civil Code Section 1668."

LaBelle sent the superseding reservation of rights letter to DeMay's attorney on June 10, 1992. It consisted of 10 single-spaced pages that quoted

---

[3]Civil Code section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." Our Supreme Court has noted that "[s]ection 1668 applies to contractual exemptions from liability, not to indemnity contracts. . . . An insurance policy is an indemnity contract." (*Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 767 [110 Cal.Rptr.2d 844, 28 P.3d 889], citations omitted.)

and discussed the policy provisions as to which Truck reserved its rights. The letter did not define "occurrence" nor did it refer to Insurance Code section 533 or Civil Code section 1668. There was no reservation of rights as to willful or intentional acts, though coverage for punitive damages was expressly excluded. The letter stated in part: "Our firm has been retained by Truck Insurance Exchange (Truck) with respect to the coverage aspects of the [Shafer/Tri-County Builders] matter. Please be advised that Truck has elected to replace and supersede its previously communicated May 18, 1992 reservation of rights with [this] reservation of rights." The letter to DeMay's attorney concluded: "Truck has made arrangements for your clients' defense to be handled by the law firm of Bodkin, McCarthy, Sargent & Smith. You will soon be contacted by [a Bodkin attorney] to make arrangements for transfer of the file. . . . Obviously, to the extent that Mr. DeMay also wishes to retain . . . your professional services, he is free to do so at his own expense."

The superseding reservation of rights letter, when read in context with the first reservation of rights letter and LaBelle's June 11, 1992 letter to Lundblad, implicitly acknowledged that, while an insurance policy cannot provide indemnity for willful acts (see Ins. Code, § 533), an insurer may agree to pay indemnity *after* an insured has committed a willful act. If the insurer so agrees, the insured (DeMay) is entitled to indemnification if he relies on that agreement to his detriment, for example, by discharging his own counsel in order to be represented by counsel chosen by the insurer. (See *Tomerlin v. Canadian Indemnity Co.* (1964) 61 Cal.2d 638, 643-649 [39 Cal.Rptr. 731, 394 P.2d 571]; *Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 511 [78 Cal.Rptr.2d 142] [discussing *Tomerlin*]; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2002) ¶¶ 7:327, 7:745 to 7:751, pp. 7A-86.2, 7B-64.1 to 7B-64.3 (rev. #1 2001) [same].)

The arbitration commenced on March 1, 1993, before a three-member panel. There were 20 days of evidentiary hearings, one day of site inspection, and one day of closing arguments. The parties produced 20 witnesses and numerous exhibits.

On July 26, 1993, the panel unanimously found in favor of the Shafers, awarding them $153,732 in general damages, $85,166 in attorneys' fees and costs, $40,513 in pre-award interest, $31,891.31 to cover AAA administrative fees and the arbitrators' compensation, and $25,000 in punitive damages against DeMay, totaling $336,302.31.

In the arbitration award, which referred to Tri-County Builders, DeMay, and Hanstad collectively as "respondents," the arbitrators found that "respondents failed to accurately cost the project from the outset, and never

adequately scheduled the job. Respondents failed to properly supervise, and failed to properly man the job. Respondents failed to complete the job as scheduled after repeated assurances and revisions of completion dates. Respondents provided poor workmanship."

The arbitrators also found that "[r]espondent DeMay committed a fraudulent act at the time he entered into the [Construction] Agreement, that he never intended to complete the project within the times repeatedly promised, and ignored the . . . Agreement with absolute impunity. Respondent DeMay repeatedly extracted payment of additional monies in advance of work performed while promising to complete the project with new extended completion dates. The Panel further finds that Respondent DeMay committed other acts of fraud . . . .

"The Panel finds that there was a scheme and design by Respondent DeMay commencing at a time before signing the original contract with [the Shafers], designed to extract profits from items through change orders which should have been included within the scope of the original contract. . . .

"Moreover, Respondents' estimated cost had gross deficiencies which were part of the misrepresentation and fraud. . . . [¶] . . . [¶]

"The failure to properly price the electrical service was a sham. . . .

"Respondent DeMay failed to thoroughly inspect the existing house before he authorized signing the initial construction contract, notwithstanding the fact this was the largest project DeMay had entered into to date.

"The Panel finds that these events collectively are more than breach of contract and negligence. They evidence a scheme and design that Respondent DeMay never intended to build the project for the price and within the time originally contracted for."

Based on these findings, the arbitrators awarded $25,000 in punitive damages against DeMay. The arbitrators found that the fraudulent nature of DeMay's conduct had been established by clear and convincing evidence, the standard used in civil actions (see Civ. Code, § 3294, subd. (c)(3)).

On October 20, 1993, the Superior Court for the County of Los Angeles confirmed the arbitration award, entering judgment in the Shafers' favor and against Tri-County Builders, DeMay, and Hanstad in the amount of $311,302.31, plus $25,000 in punitive damages against DeMay (*Shafer v. Tri-County Builders* (Super. Ct. L.A. County, 1993, No. BS025082)).

By letter dated December 8, 1993, counsel for the Shafers wrote to LaBelle, saying: "Now that the arbitrator's Award in this matter has been rendered into an enforceable Judgment, the Shafers ask that Truck Insurance Exchange ('Truck') satisfy that Judgment against its insureds. [¶] We remind Truck that the Shafers now have the right to sue Truck directly if Truck will not voluntarily satisfy the Judgment." The Shafers expected Truck to pay the entire judgment.

On March 16, 1994, LaBelle sent a letter to the Shafers' attorney, enclosing a check for $120,000. The letter indicated that the check was for $85,166 in attorneys' fees, $31,891.31 to reimburse the Shafers for AAA fees and the arbitrators' compensation, and $2,942.69 for "miscellaneous property damage."

In the letter, LaBelle stated: "Truck is making a good faith payment of these items at this time, but is reserving its right to reimbursement of these amounts from the Shafers should a determination be made in a court of law that these items, in fact, are not covered under Truck's policy. Truck incorporates herein by reference the June 10, 1992 reservation of rights [letter] previously issued to its insured. Truck also reserves its rights under California case and statutory law, and in accordance with California public policy which precludes indemnity for damages based upon a finding of fraud. [¶] The Shafers are free to negotiate this check without waiving their rights to claim that an additional portion of the award is covered under the Truck policy."[4]

Truck's payment of $120,000 left an unpaid sum of $150,789.31 in general damages, $40,513 in pre-award interest, and $25,000 in punitive damages, totaling $216,302.31. From March to July 1994, LaBelle and the Shafers' attorney exchanged a series of letters, with the Shafers seeking additional payment on the judgment and LaBelle refusing on behalf of Truck.

In a letter dated May 6, 1994, LaBelle commented: "On page 3 of the arbitration award, the arbitrators state that the insured 'never intended to complete the project within the times repeatedly promised . . . .' Page 6 of

---

[4]Although LaBelle's letter to the Shafers' attorney, Craig Rossell, referred to the June 10, 1992, reservation of rights letter, there is nothing in the record to establish that LaBelle provided Rossell with a copy of it. LaBelle's letter to Rossell stated that the check for $120,000 was enclosed, and the pertinent exhibit in the record consists solely of that letter and the check. Further, the first amended complaint alleges that the Shafers did not learn about the existence or contents of the two reservation of rights letters until at least four years and nine months after LaBelle sent the letter to Rossell.

zthe arbitration award states that the insured 'never <u>intended</u> to build the project for the price and within the time originally contracted for.'

"The intent of the insured is a critical issue in the analysis of . . . coverage. Section B1 of the policy states that the Company will pay for 'damage to property . . . caused by an <u>occurrence</u> to which this insurance applies.' Occurrence is defined in paragraph 40(m) as 'an event . . . proximately caused by an act or omission of the insured . . . which results . . . in bodily injury or property damage, <u>neither expected nor intended from the standpoint of the insured</u>.' This policy language is consistent with section 533 of the Insurance Code, which states '[a]n insurer is not liable for loss caused by the willful act of the insured . . . .'

"Therefore, while the arbitration award is vague as to the division of the $153,232 awarded in damages, it is very clear on its finding that the insured never <u>expected</u> or <u>intended</u> to complete the project on time." (Underscoring in original.)

Meanwhile, Truck and DeMay entered into a settlement agreement under which Truck paid DeMay $35,000 as part of a mutual release of all claims. DeMay agreed to assist Truck in any proceedings arising out of the arbitration award and to keep the existence and terms of the settlement confidential. Shortly after signing the settlement agreement, DeMay moved to the Canadian-Wisconsin border to avoid enforcement of the Shafers' judgment.

Hanstad, too, sought to avoid the judgment. He filed for bankruptcy. The Shafers filed a petition in the bankruptcy proceeding, alleging that the debt was not dischargeable because it was based on fraudulent conduct. (See 11 U.S.C. § 523(a)(2).) Because Truck was not paying the entire amount owed on the judgment, the Shafers needed to preserve their claim against Hanstad. Ultimately, the entire amount of the judgment was declared nondischargeable.

Truck monitored developments in the bankruptcy proceeding. In an internal memo dated November 30, 1994, one Truck employee wrote to another: "The issue [in the bankruptcy proceeding] is that the Shafers are claiming that the judgment they have obtained against [Hanstad] is related to fraud and intentional acts and that this is a non-dischargeable judgment . . . .

"Accordingly, that plays right into our hands in that they cannot argue to a court of law both that the remaining claims against Tri-County Builders are intentional and fraudulent claims which cannot be discharged through bankruptcy and that they are unrelated to any fraud and intentional acts by the insured and should be compensated by Truck . . . .

"We believe that all monies owed on this matter have been paid. This matter is basically closed except for [the Shafers' direct action against Truck] which may follow. However, we do not expect the . . . Shafers to actually follow through with their threats of filing suit. This matter is being handled primarily by Lance LaBelle of the Law Offices of Berger, Kahn."

In 1996, Hanstad sued Truck for bad faith. He was represented by counsel for the Shafers. In December 1998, during the discovery phase of the case, the Shafers' attorney learned for the first time that Truck had agreed to indemnify Tri-County Builders, DeMay, and Hanstad for willful acts. That knowledge was confirmed in early 1999, when LaBelle's deposition was taken. Ultimately, Hanstad prevailed against Truck for bad faith.

On June 22, 2000, the Shafers filed this action against Truck, LaBelle, and LaBelle's firm, alleging causes of action for breach of contract, bad faith, and fraud. LaBelle and his firm (collectively LaBelle) were named on the fraud claim only. LaBelle filed a demurrer, arguing that he did not owe the Shafers a duty of truthful disclosure about the coverage afforded by Truck and that the Shafers had not justifiably relied on any statements he had made. The trial court sustained the demurrer with leave to amend.

The Shafers filed a first amended complaint. It retained the cause of action against LaBelle for fraud and added a cause of action against LaBelle and Truck for conspiracy. The amended complaint read as follows: After the Shafers obtained a judgment against Truck's insureds, LaBelle represented to the Shafers that Truck had not agreed to provide indemnity for willful acts. In fact, Truck had agreed to indemnification. While LaBelle and Truck knew that the statement about indemnity was false, the Shafers did not know of its falsity. LaBelle made the false statement with the intention of inducing the Shafers to forgo full payment on the judgment. The Shafers relied on LaBelle's false statement, resulting in economic and noneconomic damages.

LaBelle filed a demurrer to the amended complaint, making the same arguments as before. LaBelle also asserted that the Shafers' conspiracy claim was barred by section 1714.10 of the Civil Code, which prohibits a conspiracy claim against an attorney unless the trial court first determines that the plaintiff has a reasonable probability of prevailing on the merits.[5]

By order filed December 26, 2000, the trial court sustained the demurrer without leave to amend, agreeing with the arguments made in LaBelle's

---

[5]Civil Code section 1714.10, subdivision (a), states in part: "No cause of action against an attorney for a civil conspiracy with his or her client . . . shall be included in a complaint or other pleading unless the court enters an order allowing the pleading that includes the claim for civil conspiracy to be filed after the court determines that the party seeking to file the

papers. An order of dismissal and judgment were duly entered. The Shafers filed a timely appeal.

## II

### DISCUSSION

The Shafers argue on appeal that the trial court erred in dismissing the causes of action for fraud and conspiracy. We agree. LaBelle owed the Shafers a duty not to make fraudulent statements about the insurance coverage provided by Truck. And, contrary to LaBelle's contention, the Shafers' reliance on his statements was justifiable. For his part, LaBelle contends that this action is barred because the litigation privilege (Civ. Code, § 47, subd. (b)) protected his statements about insurance coverage. With that we disagree. As for the conspiracy claim, Civil Code section 1714.10 does not preclude liability because LaBelle had an independent duty not to injure the Shafers through fraudulent statements.

### A. *Misrepresentation of Coverage*

█ In reviewing the sufficiency of a complaint against a general demurrer that was sustained, we treat the demurrer as admitting all material facts that are properly pleaded and determine whether the complaint states facts sufficient to constitute a cause of action. (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318; accord, *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171].) "In the construction of a pleading, for the purpose of determining its effect, its allegations must be liberally construed, with a view to substantial justice between the parties." (Code Civ. Proc., § 452.)

Section 11580 of the Insurance Code requires that liability insurance policies, with exceptions not relevant here, contain a provision stating that "whenever judgment is secured against the insured . . . in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment." (Ins. Code, § 11580, subd. (b)(2).) If that provision does not appear in a policy, it is implied by law. (*Id.,* § 11580; all further references to § 11580 are to the Insurance Code.) The Shafers filed the present action, in part, pursuant to section 11580.

---

pleading has established that there is a reasonable probability that the party will prevail in the action. . . ."

■ Upon obtaining a judgment against the insured, the judgment creditor has an independent cause of action against the insurer to enforce the insurer's obligation to indemnify the insured. (*Gonzalez v. St. Paul Mercury Ins. Co.* (1976) 60 Cal.App.3d 675, 680-681 [131 Cal.Rptr. 626].) "The judgment creditor's right to sue is not derivative or dependent upon any assignment from the insured." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 15:1039, p. 15-187.) Section 11580 "makes the judgment creditor a third party beneficiary of the insurance contract between the insurer and the insured." (*Murphy v. Allstate Ins. Co.* (1976) 17 Cal.3d 937, 943 [132 Cal.Rptr. 424, 553 P.2d 584] (*Murphy*).)

Under section 11580, "a judgment creditor may proceed directly against any liability insurance covering the defendant, and obtain satisfaction of the judgment up to the amount of the policy limits." (*Reliance Ins. Co. v. Superior Court* (2000) 84 Cal.App.4th 383, 386 [100 Cal.Rptr.2d 807].) Such a claim is subject to the terms and limitations of the policy, including any reservation of rights. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶¶ 15:1123 to 15:1136, pp. 15-200.1 to 15-200.2 (rev. #1 2001).)

In applying section 11580, we rely on principles of agency law dating back more than a century, as codified in the Civil Code. **(3)** "An agent is one who represents another, called the principal, in dealings with third persons. Such representation is called agency." (Civ. Code, § 2295.) "One who assumes to act as an agent is responsible to third persons as a principal for his acts in the course of his agency . . . [¶] . . . [¶] . . . [w]hen his acts are wrongful in their nature." (*Id.*, § 2343.)

" 'An agent or employee is always liable for his own torts, whether his employer is liable or not.' " (*Holt v. Booth* (1991) 1 Cal.App.4th 1074, 1080, fn. 5 [2 Cal.Rptr.2d 727]; accord, *Michaelis v. Benavides* (1998) 61 Cal.App.4th 681, 686 [71 Cal.Rptr.2d 776].) "In other words, when the agent commits a tort, such as . . . fraud . . . , then . . . the agent [is] subject to liability in a civil suit for such wrongful conduct." (*Mottola v. R.L. Kautz & Co.* (1988) 199 Cal.App.3d 98, 108 [244 Cal.Rptr. 737]; accord, *Crawford v. Nastos* (1960) 182 Cal.App.2d 659, 664-665 [6 Cal.Rptr. 425, 97 A.L.R.2d 840]; see generally 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 149, p. 144.)

" '[I]f a tortious act has been committed by an agent acting under authority of his principal, the fact that the principal thus becomes liable does not, of course, exonerate the agent from liability.' . . . The fact that the tortious act

arises during the performance of a duty created by contract does not negate the agent's liability." (*Bayuk v. Edson* (1965) 236 Cal.App.2d 309, 320 [46 Cal.Rptr. 49].)

██ The relationship of attorney and client is one of agent and principal. (See *CPI Builders, Inc. v. Impco Technologies, Inc.* (2001) 94 Cal.App.4th 1167, 1174 [114 Cal.Rptr.2d 851]; *Caro v. Smith* (1997) 59 Cal.App.4th 725, 731 [69 Cal.Rptr.2d 306]; see also *Levy v. Superior Court* (1995) 10 Cal.4th 578, 583-584 [41 Cal.Rptr.2d 878, 896 P.2d 171].) As with other types of agency relationships, "[t]he law of misrepresentation applies to lawyers." (Rest.3d, Law Governing Lawyers (2000) § 98, com. c, p. 59.) "Lawyers are subject to the general law. If activities of a nonlawyer in the same circumstances would render the nonlawyer civilly liable . . . , the same activities by a lawyer in the same circumstances generally render the lawyer liable . . . ." (*Id.*, § 56, com. b, p. 416.)

"A lawyer communicating on behalf of a client with a nonclient may not . . . [¶] . . . knowingly make a false statement of material fact . . . to the nonclient . . . ." (Rest.3d, Law Governing Lawyers, § 98, p. 58.) "The law governing misrepresentation by a lawyer includes the criminal law (theft by deception), *the law of misrepresentation in tort law* and of mistake and fraud in contract law, and procedural law governing statements by an advocate . . . . Compliance with those obligations meets social expectations of honesty and fair dealing and facilitates negotiation and adjudication, which are important professional functions of lawyers." (*Id.*, com. b, pp. 58-59, citation omitted, italics added.) "A misrepresentation can occur through direct statement or through affirmation of a misrepresentation of another, as when a lawyer knowingly affirms a client's false or misleading statement." (*Id.*, com. c, p. 59.)

As one of our courts has stated: "In the context of fraudulent conduct by an attorney toward persons not his own clients, no preference is accorded to the attorney's professional status in the disposition of claims alleging fraud. If an attorney commits actual fraud in his dealings with a third party, the fact he did so in the capacity of attorney for a client does not relieve him of liability. [Citation.] While in general an attorney's professional duty of care extends only to dealings with his own client and to intended beneficiaries of the legal work performed, these limitations upon liability for negligence . . . do not apply to liability for fraud. [Citation.]" (*Jackson v. Rogers & Wells* (1989) 210 Cal.App.3d 336, 345 [258 Cal.Rptr. 454], citing *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 346 [134 Cal.Rptr. 375, 556 P.2d 737].)

"In general, a lawyer who makes a fraudulent misrepresentation is subject to liability to the injured person when the other elements of the tort are

established . . . ." (Rest.3d, Law Governing Lawyers, § 98, com. g, p. 61.) This rule "applies equally to statements made to a sophisticated person, such as to a lawyer representing another client, as well as to an unsophisticated person." (*Id.*, com. b, p. 59.) "Misrepresentation is not part of proper legal assistance; vigorous argument often is. Thus, lawyers are civilly liable to clients and nonclients for fraudulent misrepresentation, but are not liable for such conduct as using legally innocuous hyperbole or proper argument in negotiations . . . or presenting an argument to a tribunal in litigation." (*Id.*, § 56, com. f, p. 418.)

In *Cicone v. URS Corp.* (1986) 183 Cal.App.3d 194 [227 Cal.Rptr. 887] (*Cicone*), the court held that an attorney may be liable to a nonclient for fraudulent statements made during business negotiations. There, the sellers and the buyer in a business acquisition were represented by their respective counsel, who conducted the transaction. The buyer drafted a proposed written agreement containing a provision obligating the sellers to warrant the accuracy of the company's balance sheet. The sellers objected to that provision and refused to guarantee the accuracy of the company's financial information. In response, the buyer stated that he understood and would deem the sellers to be guaranteeing the balance sheet to the best of their knowledge. The sellers signed the agreement without modification.

At the time the buyer agreed to accept the sellers' best knowledge, he had no intention of honoring it but intended to rely on the strict warranty in the written agreement. The sellers relied on the buyer's oral statement in signing the agreement. The balance sheet was, in fact, correct to the best of the sellers' knowledge. But, after the transaction was completed, the buyer claimed that the sellers had understated tax liabilities in the amount of $200,000. The sellers settled the claim without litigation and filed suit against their attorney for malpractice. He cross-complained against the buyer's attorney, alleging causes of action for negligence, equitable indemnity, fraud, and deceit. The buyer's attorney filed a demurrer, arguing that he owed no duty to the sellers or their attorney. The trial court agreed, sustained the demurrer without leave to amend, and dismissed the cross-complaint.

The Court of Appeal reversed, explaining: "[The buyer's attorney] argue[s] a lack of duty owed to [the sellers' attorney]. However, this argument appears in relation to the causes of action for negligence and indemnity. More properly it could be stated, inferentially everyone has a duty to refrain from committing intentionally tortious conduct against another. Thus, a promise material to the contract which is made without any intention of performing it is deemed a misrepresentation of fact. . . .

"[The sellers' attorney] alleges [that the buyer and his attorney] made a promise without disclosing they entertained no intention to perform said promise to deem the warranty of the financial statement as only to sellers' best knowledge and belief.

"Although a duty to disclose a material fact normally arises only where there exists a confidential relation between the parties or other special circumstances require disclosure, where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated. . . .

" 'The extent of liability an attorney may incur toward third persons, while the attorney is acting on behalf of a client, has been the subject of divergent opinion in various American jurisdictions, the traditional view being that an attorney may not generally be held liable to third persons because he is not in privity with them, and owes them no duty to act with care. . . . A typical statement of this approach is that "an attorney is not liable to third persons for acts committed in good faith in performance of professional activities as an attorney for his client. If, however, an attorney is actuated by malicious motives, or shares the illegal motives of his client, he may be personally liable with the client for damage suffered by a third person as the result of the attorney's actions." . . .' . . .

"In California it is well established that an attorney may not, with impunity, either conspire with a client to defraud or injure a third person or engage in intentional tortious conduct toward a third person. . . .

"Thus, the case law is clear that a duty is owed by an attorney not to defraud another, even if that other is an attorney negotiating at arm's length.

"Thus, while duty is not an element of fraud in the traditional sense, a duty is owed to others to refrain from intentionally tortious conduct. Therefore, any inference arising from the lower court's decision that the element of duty bars [the sellers' attorney's] causes of action for fraud and deceit [against the buyer's attorney] is not supported by law." (*Cicone, supra,* 183 Cal.App.3d at pp. 201-202, citations omitted.)

As early as 1895, when strict notions of privity ruled the day, our Supreme Court recognized that an attorney could be held liable for defrauding a third party, even without privity, stating: "It is a general doctrine . . . that an attorney is liable for negligence in the conduct of his professional duties . . . to his client alone . . . and not to third parties. The *exceptions* to this general rule . . . are where *the attorney has been guilty of fraud* or collusion, or of a

malicious or tortious act. Responsibility for a fraudulent act is independent of any contractual relation between the guilty party and the one injured; and one committing a malicious or tortious act, to the injury of another, is liable therefor, without reference to any question of privity between himself and the wronged one." (*Buckley v. Gray* (1895) 110 Cal. 339, 342 [42 P. 900], italics added, disapproved on another point in *Biakanja v. Irving* (1958) 49 Cal.2d 647, 648-651 [320 P.2d 16, 65 A.L.R.2d 1358].)

More recently, in a case brought by a nonclient against an attorney for fraud, the Court of Appeal concluded that an attorney "had a duty to abstain from injuring [a third party] through express misrepresentation. . . . [¶] . . . [¶] . . . '[W]here one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated. . . . One who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.' " (*Pavicich v. Santucci* (2000) 85 Cal.App.4th 382, 397-398 [102 Cal.Rptr.2d 125].)

In a similar case, the Iowa Supreme Court quoted extensively from the Restatement Third of the Law Governing Lawyers and discussed *Cicone*, *supra*, 183 Cal.App.3d 194, in holding that "once a lawyer responds to a request for information in an arm's-length transaction and undertakes to give that information, the lawyer has a duty to the lawyer requesting the information to give it truthfully. Such a duty is an independent one imposed for the benefit of a particular person or class of persons. . . . [¶] Public policy favors a duty, running from an attorney representing a party to a commercial transaction, not to make fraudulent misrepresentations to an attorney representing the adverse party in the transaction." (*Hansen v. Anderson, Wilmarth* (Iowa 2001) 630 N.W.2d 818, 825-826 (*Hansen*).)

The principles set forth in the Restatement are not limited to business transactions. They "may apply in representing a client in litigation, such as when negotiating a settlement." (Rest.3d, Law Governing Lawyers, § 98, com. a, p. 58.) In *Fire Ins. Exchange v. Bell by Bell* (Ind. 1994) 643 N.E.2d 310, the principal question was "whether, and to what extent, a party who is represented by counsel has the right to rely on a representation by opposing counsel during settlement negotiations." (*Id.* at p. 311.) In that case, an infant was severely burned at his grandfather's home when a water heater ignited a fire. The infant's mother retained counsel, Robert Collins, who contacted Farmers Group, Inc., which had issued the grandfather's homeowners policy.

In negotiating a settlement, the attorney for Farmers stated that the policy limits were $100,000 when they were actually $300,000, as he knew. Based

on that false information, Collins advised the infant's mother to settle for $100,000 and she did so. In subsequent litigation against the manufacturer of the water heater, Collins learned that the Farmers policy had limits of $300,000.

Collins filed an action on behalf of the infant against Farmers and its attorney, alleging a cause of action based on the misrepresentation of the policy limits. The defendants moved for summary judgment, contending that Collins "had, as a matter of law, no right to rely on the alleged misrepresentations because he was a trained professional involved in adversarial settlement negotiation and had access to the relevant facts." (*Fire Ins. Exchange v. Bell by Bell, supra*, 643 N.E.2d at p. 312 (*Fire Ins. Exchange*).) The trial court denied summary judgment. The Indiana Supreme Court affirmed, stating:

"The reliability and trustworthiness of attorney representations constitute an important component of the efficient administration of justice. A lawyer's representations have long been accorded a particular expectation of honesty and trustworthiness. [¶] . . . [¶]

". . . The reliability of lawyers' representations is an integral component of the fair and efficient administration of justice. The law should promote lawyers' care in making statements that are accurate and trustworthy and should foster the reliance upon such statements by others." (*Fire Ins. Exchange, supra*, 643 N.E.2d at pp. 312-313.) The court concluded that, as a matter of law, Collins had the right to rely on opposing counsel's representation of the policy limits. (*Id.* at p. 313.)

The United States Court of Appeals for the Second Circuit reached the same conclusion in *Slotkin v. Citizens Cas. Co. of New York* (2d Cir. 1979) 614 F.2d 301 (*Slotkin*). There, the attorneys for an insurer in a medical malpractice case stated that the policy limits were $200,000, failing to mention that there was an additional $1 million in excess coverage. The plaintiffs settled for $185,000.

Upon learning of the misrepresentation, the plaintiffs brought a diversity action against the insurer's attorneys, alleging fraud. The plaintiffs prevailed. In upholding the verdict as to one of the attorneys, the Second Circuit, applying New York law, stated: "[The insurer's attorney] stipulated that 'to the best of his knowledge' there was only $200,000 worth of coverage . . . . [His] insistence that the policy limit was $200,000 . . . renders him liable under the New York definition of scienter as 'a reckless indifference to error,' 'a pretense of exact knowledge,' or '[an] assertion of

a false material fact "susceptible of accurate knowledge" but stated to be true on the personal knowledge of the representer.' " (*Slotkin, supra,* 614 F.2d at p. 314.)

Turning to the present case, under California law, "[f]raud is an intentional tort, the elements of which are (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." (*Cicone, supra,* 183 Cal.App.3d at p. 200; accord, 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 676, p. 778.) LaBelle argues that his statement about insurance coverage was not a representation of fact but a nonactionable legal opinion. He also contends that he did not owe the Shafers a duty to make truthful statements about coverage and that they did not justifiably rely on any statements he made. Based on the allegations of the first amended complaint, we disagree.

### 1. *Misrepresentation of Fact*

In the arbitration, the Shafers prevailed against the insureds (Tri-County Builders, DeMay, and Hanstad). After judgment was entered on the arbitration award, the Shafers looked to Truck for payment, as was their statutory right. In a series of letters, the Shafers' attorney and LaBelle discussed the coverage afforded by Truck and whether the Shafers were entitled to more than $120,000.

LaBelle's June 11, 1992, letter to Lundblad at Truck—when read together with the first and the superseding reservation of rights letters—confirmed that Truck had agreed to cover willful acts under the policy. In the June 11 letter, LaBelle referred to his prior discussion with Lundblad about affording coverage for "both the intentional and negligence based causes of action in the complaint" and explained that the June 10, 1992, superseding reservation of rights letter did not refer to the policy's definition of "occurrence" or the statutory exclusion for willful acts. LaBelle also confirmed that the superseding reservation of rights letter was "an effort to modify the [first] reservation of rights [letter] so as to not trigger the *Cumis* obligation [(*Cumis, supra,* 162 Cal.App.3d 358)]." In that way, Truck extended coverage to willful acts and avoided having to pay for *Cumis* counsel. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶¶ 7:769 to 7:790.5, pp. 7B-64.10 to 7B-65 [discussing insured's right to *Cumis* counsel].)

Yet, in letters to the Shafers' attorney dated March 16 and May 6, 1994, LaBelle pointed to the "occurrence" provision in the policy and the statutory exclusion for willful acts to justify Truck's payment of only $120,000

toward a judgment totaling $336,302.31. Thus, LaBelle allegedly misrepresented the scope of insurance coverage. He had a duty not to make fraudulent statements. (See *Goodman v. Kennedy, supra,* 18 Cal.3d at p. 346; *Buckley v. Gray, supra,* 110 Cal. at p. 342; *Pavicich v. Santucci, supra,* 85 Cal.App.4th at pp. 392, 397-398; *Jackson v. Rogers & Wells, supra,* 210 Cal.App.3d at p. 345; *Cicone, supra,* 183 Cal.App.3d at pp. 201-202; *Fire Ins. Exchange, supra,* 643 N.E.2d at pp. 312-313; *Hansen, supra,* 630 N.W.2d at pp. 825-826; *Slotkin, supra,* 614 F.2d 301; Rest.3d, Law Governing Lawyers, § 98, coms. a-c, pp. 58-59.)

Indeed, "cases from twenty-eight states hold[] that '[a]n attorney can be liable to a nonclient, even an adversary in litigation, for fraud or deceit.'" (*Hansen, supra,* 630 N.W.2d at p. 825, citing 1 Mallen & Smith, Legal Malpractice (5th ed. 2000) § 6.7 fn. 1, p. 564.)

"A knowing misrepresentation may relate to a proposition of fact . . . . Certain statements, such as some statements relating to price or value, are considered nonactionable hyperbole or a reflection of the state of mind of the speaker and not misstatements of fact . . . . Whether a misstatement should be so characterized depends on *whether it is reasonably apparent that the person to whom the statement is addressed would regard the statement as one of fact* or based on the speaker's knowledge of facts reasonably implied by the statement or as merely an expression of the speaker's state of mind. Assessment depends on the circumstances in which the statement is made, including the past relationship of the negotiating persons, their apparent sophistication, the plausibility of the statement on its face, the phrasing of the statement, related communication between the persons involved, the known negotiating practices of the community in which both are negotiating, and similar circumstances. In general, a lawyer who is known to represent a person in a negotiation will be understood by nonclients to be making *nonimpartial* statements, in the same manner as would the lawyer's client." (Rest.3d, Law Governing Lawyers, § 98, com. c, pp. 59-60, italics added.)

In light of the foregoing factors, the first amended complaint adequately pleads that LaBelle made a fraudulent statement about the insurance coverage provided by Truck, and the Shafers reasonably viewed his statement as one of fact.

### 2. *Justifiable Reliance*

The Shafers justifiably relied on LaBelle's alleged false statements. They had no reason to doubt him. They did not know that LaBelle had sent DeMay's attorney two reservation of rights letters, nor did they know the contents of either one. Like the plaintiffs in *Fire Ins. Exchange, supra,* 643

N.E.2d 310, *Hansen, supra,* 630 N.W.2d 818, and *Slotkin, supra,* 614 F.2d 301, the Shafers reasonably relied on the coverage representations made by counsel for an insurance company.

In a March 16, 1994, letter to the Shafers' attorney, LaBelle stated that "[Truck] reserves its rights under California case and statutory law, and in accordance with California public policy which precludes indemnity for damages based upon a finding of fraud." As alleged in the operative complaint, "[the Shafers'] reliance on [LaBelle's] fraudulent concealment was well justified. . . . [W]ithout the reservation of rights letters, [the Shafers] had no real choice but to rely on [LaBelle's] pronouncements about lack of coverage for intentional acts. [The Shafers'] attorneys understood that intentional misconduct by an insured precludes coverage under any policy of insurance. What they did not know, and what [LaBelle] failed to reveal . . . , was that the manner in which [Truck] had reserved its rights under the policy tacitly expanded coverage to include intentional misconduct by the insured . . . ." Elsewhere in the amended complaint, the Shafers alleged that they did not obtain evidence about the fraudulent nature of LaBelle's statements until late 1998 and early 1999, during discovery in related litigation.

If the Shafers had known or suspected the truth—that Truck had agreed to provide coverage for willful acts—they would have aggressively sought full payment of the judgment at the outset instead of accepting for a payment of $120,000 in March 1994. But the Shafers believed LaBelle. They did not file suit until June 2000—six years and eight months after the entry of judgment—when they learned about the alleged fraud. In the meantime, the Shafers allegedly incurred economic and noneconomic damages.

Further, LaBelle's relationship vis-à-vis the Shafers was not that of an *opposing* participant or party. Under section 11580, Truck had to pay the Shafers the amount of the judgment, subject to the terms and limitations of the insurance policy, including any reservation of rights. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶¶ 15:1123 to 15:1136, pp. 15-200.1 to 15-200.2.) In that sense, the Shafers were to be treated as the insureds. Section 11580 "inure[s] to the benefit of any and every person who might be negligently injured by the assured as completely as if *such injured person had been specifically named in the policy.*" (*Malmgren v. Southwestern A. Ins. Co.* (1927) 201 Cal. 29, 33 [255 P. 512], italics added; construing Stats. 1919, ch. 367, § 1, p. 776, now § 11580; see Historical Note, 43 West's Ann. Ins. Code (1988 ed.) foll. § 11580, p. 242.) And, as stated, the Shafers were third party beneficiaries of the insurance policy. (See, e.g., *Murphy, supra,* 17 Cal.3d at pp. 942-943.)

We also observe that LaBelle is trying to have his cake and eat it too. He advised Truck to provide coverage for willful acts so that Truck would not have to pay for *Cumis* counsel. Yet, LaBelle represented to the Shafers that willful acts were not covered so that Truck would not have to pay the total amount due on the judgment.

LaBelle's case authority does not support his position that the Shafers could not justifiably rely on his word. In *Goodman v. Kennedy, supra,* 18 Cal.3d 335, the plaintiffs (nonclients) sued an attorney for erroneous advice about purchasing stock from his clients. But "[t]here [was] no allegation that the advice was ever communicated to plaintiffs and hence no basis for any claim that they relied upon it in purchasing or retaining the stock." (*Id.* at p. 343; see *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 411 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835] [discussing *Goodman*].) Here, LaBelle made the misrepresentations directly to the Shafers, and they relied on his statements in failing to seek full payment on the judgment.

In *Parnell v. Smart* (1977) 66 Cal.App.3d 833 [136 Cal.Rptr. 246], the plaintiff was not allowed to bring a legal malpractice action against the attorneys who had represented the opposing side in prior proceedings. In particular, the plaintiff argued that "an insurance carrier's retained counsel owes a duty to a third party . . . to disclose to the carrier all settlement offers made in the course of that claim." (*Id.* at p. 837.) The Shafers do not make any such argument.

In *B.L.M. v. Sabo & Deitsch* (1997) 55 Cal.App.4th 823 [64 Cal.Rptr.2d 335], the court held that a law firm was not liable to a nonclient for negligent misrepresentation where the complaint did not allege either an intent to induce the nonclient to rely on the attorneys' advice or the nonclient's justifiable reliance on that advice. (*Id.* at pp. 834-841.) In the instant case, those elements of fraud are alleged, and LaBelle does not contend otherwise.

Thus, LaBelle had a duty not to make fraudulent statements to the Shafers about the insurance coverage provided by Truck. The first amended complaint alleges that the Shafers justifiably relied on a misrepresentation of that sort. It follows that the trial court erred in sustaining the demurrer.

## B. *Litigation Privilege*

LaBelle contends that the "litigation privilege" (Civ. Code, § 47, subd. (b)) applied to his statements about insurance coverage, rendering them nonactionable. LaBelle did not raise this issue below, but "it is well settled that when the issue raises a pure question of law . . . , we may consider the

issue for the first time on appeal." (*Gilliland v. Medical Board* (2001) 89 Cal.App.4th 208, 219 [106 Cal.Rptr.2d 863].)

■ We conclude that the litigation privilege does not shield LaBelle from liability for fraud because his alleged misrepresentations were made to a party standing in the shoes of an insured, and the application of the litigation privilege in this case would be inconsistent with the purpose of section 11580.

■ In general, the litigation privilege precludes liability for communications made in any proceeding of a legislative, judicial, or official nature, and in proceedings where a writ of mandate is sought. (Civ. Code, § 47, subd. (b).) "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212 [266 Cal.Rptr. 638, 786 P.2d 365].) "Because the privilege applies without regard to malice or evil motives, it has been characterized as 'absolute.'" (*Brown v. Kennard* (2001) 94 Cal.App.4th 40, 45 [113 Cal.Rptr.2d 891]; accord, *Aronson v. Kinsella* (1997) 58 Cal.App.4th 254, 261-266 [68 Cal.Rptr.2d 305].)[6]

"The principal purpose of [the litigation privilege] is to afford litigants and witnesses . . . the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. . . . [¶] . . . [¶]

"[I]n immunizing participants from liability for torts arising from communications made during judicial proceedings, the law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result." (*Silberg v. Anderson, supra,* 50 Cal.3d at pp. 213-214, citations omitted.) "'In other words, the litigation privilege is intended to encourage parties to feel free to exercise their fundamental right of resort to the courts for assistance in the resolution of their disputes, without being chilled from exercising this right by the fear that they may subsequently be sued in a derivative tort action arising out of something said or done in the context of the litigation. . . .'" (*Aronson v. Kinsella, supra,* 58 Cal.App.4th at p. 262.)

■ Turning to section 11580, our Supreme Court explained in *Murphy, supra,* 17 Cal.3d 937: "[Section 11580] makes *the judgment creditor a third*

---

[6]The litigation privilege, as codified, "does not make privileged any communication made in a judicial proceeding knowingly concealing the existence of an insurance policy or policies." (Civ. Code, § 47, subd. (b)(3).) The parties do not contend that this exception applies here.

*party beneficiary* of the insurance contract between the insurer and the insured. . . . [¶] A third party beneficiary *may enforce a contract expressly made for his benefit.* . . . And although the contract may not have been made to benefit him alone, he may enforce those promises directly made for him. . . . [¶] The injured claimant's rights under the statute may extend beyond third party beneficiary principles. In *Barrera* v. *State Farm Mut. Automobile Ins. Co.* [(1969)] 71 Cal.2d 659, 670 [79 Cal.Rptr. 106, 456 P.2d 674] . . . this court held that Insurance Code section 11580 must be read in light of the Financial Responsibility Law and that its underlying policy providing benefits to injured parties may not be limited by third party beneficiary law. On the basis of that policy, it was held that in an action by the injured claimant, misrepresentations by the insured do not constitute a defense for an insurer who failed to promptly investigate insurability." (*Murphy, supra,* 17 Cal.3d at p. 943, citations omitted, italics added.)

In *Johnson v. Holmes Tuttle Lincoln-Merc.* (1958) 160 Cal.App.2d 290 [325 P.2d 193]—one of the cases cited with approval in *Murphy, supra,* 17 Cal.3d at page 943—the Court of Appeal discussed section 11580, stating:

" 'A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it.' . . . Where one person for a valuable consideration engages with another to do some act for the benefit of a third person, and the agreement thus made has not been rescinded, the party for whose benefit the contract or promise was made, or who would enjoy the benefit of the act, *may maintain an action against the promisor for the breach of his engagement.* While the contract remains unrescinded, the relations of the parties are the same as though the promise had been made directly to the third party. Although the party for whose benefit the promise was made was not cognizant of it when made, it is, if adopted by him, deemed to have been made to him. *He may sue on the promise.* Where a promise is made to benefit a third party on the happening of a certain contingency, the third party may enforce the contract on the occurrence of that contingency. . . . The action by a third party beneficiary for the breach of the promisor's engagement does not rest on the ground of any actual or supposed relationship between the parties but on the broad and more satisfactory basis that the law, operating on the acts of the parties, creates the duty, establishes a privity, and implies the promise and obligation on which the action is founded. . . . [¶] . . . [¶] [Section 11580] is a part of every policy and creates a contractual relation which . . . benefit[s] . . . every person who might be negligently injured by the insured . . . ." (*Johnson v. Holmes Tuttle Lincoln-Merc., supra,* 160 Cal.App.2d at pp. 296-298, citations omitted, italics added.)

"It is fundamental that generally speaking the injured party may not directly sue an insurer of the alleged tortfeasor. . . . The statutory cause of action created by Insurance Code section 11580 . . . is based on the unsatisfied judgment. . . . Hence the contingency giving rise to an injured party's right as a third party beneficiary to enforce the contract is the legally established liability of the insured." (*Zahn v. Canadian Indem. Co.* (1976) 57 Cal.App.3d 509, 513 [129 Cal.Rptr. 286].)

As LaBelle would have it, the litigation privilege precludes liability for any fraudulent statements he made to the Shafers about the coverage afforded to Truck's insureds. We reject that contention. The litigation privilege does not protect fraudulent statements intended to prevent an injured party from exercising his or her rights under section 11580.

Simply put, the injured party, as "[a] third party beneficiary[,] may enforce a contract expressly made for his benefit." (*Murphy, supra,* 17 Cal.3d at p. 943.) That includes an insurance policy in cases where the injured party files suit against an insured. (*Ibid.*) The insurer has a duty to act "as if such injured person had been specifically named in the policy." (*Malmgren v. Southwestern A. Ins. Co., supra,* 201 Cal. at p. 33.) Section 11580 recognizes that "the insurer's . . . duty to pay adjudicated liabilities is in place as much *to protect . . . injured parties from uncompensated loss* as to protect the insured from personal financial disaster." (*Hand v. Farmers Ins. Exchange* (1994) 23 Cal.App.4th 1847, 1858 [29 Cal.Rptr.2d 258], italics added.)

Just as an insurer may be held liable for defrauding its insured (see *Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911, 945-947, 951 [83 Cal.Rptr.2d 89]; *Chodos v. Insurance Co. of North America* (1981) 126 Cal.App.3d 86, 98-103 [178 Cal.Rptr. 831]), so an insurer should not be allowed to deceive a third party beneficiary of the insurance policy (see *Murphy, supra,* 17 Cal.3d at pp. 942-943; *County of Mariposa v. Yosemite West Associates* (1988) 202 Cal.App.3d 791, 803, 812-813 [248 Cal.Rptr. 778]; *Shell v. Schmidt* (1954) 126 Cal.App.2d 279 [272 P.2d 82]). And if an insurer may be found liable to a third party beneficiary for fraud, so may its coverage counsel. (See *Goodman v. Kennedy, supra,* 18 Cal.3d at p. 346; *Buckley v. Gray, supra,* 110 Cal. at p. 342; *Pavicich v. Santucci, supra,* 85 Cal.App.4th at pp. 392, 397-398; *Jackson v. Rogers & Wells, supra,* 210 Cal.App.3d at p. 345; *Cicone, supra,* 183 Cal.App.3d at pp. 201-202; *Fire Ins. Exchange, supra,* 643 N.E.2d at pp. 312-313; *Hansen, supra,* 630 N.W.2d at pp. 825-826; *Slotkin, supra,* 614 F.2d 301; Rest.3d, Law Governing Lawyers, § 98, coms. a-c, pp. 58-59.)

Counsel retained by an insurer has an obligation to be truthful in describing insurance coverage to a third party beneficiary. The litigation privilege is not a license to deceive an injured party who steps into the shoes of the insured. (See pt. II.A.2., *ante*.) Section 11580 grants an injured party the right to file suit in order to recover under the insurance policy. Coverage counsel may not commit fraud in an attempt to defeat that right. And to the extent there is a conflict between an injured party's rights under section 11580 and coverage counsel's reliance on the litigation privilege (Civ. Code, § 47, subd. (b)), the rights of the injured party prevail as they arise under the more specific of the two statutes. (See *Schoendorf v. U.D. Registry, Inc.* (2002) 97 Cal.App.4th 227, 243 [118 Cal.Rptr.2d 313].)

Finally, we note that a primary purpose of the litigation privilege is to safeguard litigants and witnesses from subsequent tort suits. The privilege also encourages open channels of communication, promotes the zealous protection of clients' interests, and obligates litigants to expose the bias of witnesses and the falsity of evidence during trial. (*Silberg v. Anderson, supra*, 50 Cal.3d at pp. 213-214; *Home Ins. Co. v. Zurich Ins. Co.* (2002) 96 Cal.App.4th 17, 23, 26 [116 Cal.Rptr.2d 583] (*Home Ins. Co.*).) Those purposes are not frustrated where, consistent with section 11580, an injured party pursues a fraud claim against an insurer's coverage counsel. "We need not [condone] fraud in an effort to secure free access to the courts." (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 37 [61 Cal.Rptr.2d 518].)

The litigation privilege also serves to "enhanc[e] the finality of judgments and avoid[] an unending roundelay of litigation . . . ." (*Silberg v. Anderson, supra*, 50 Cal.3d at p. 214.) "For our justice system to function, it is necessary that litigants assume responsibility for the complete litigation of their cause during the proceedings. To allow a litigant to attack the integrity of evidence after the proceedings have concluded, except in the most narrowly circumscribed situations, such as extrinsic fraud, would impermissibly burden, if not inundate, our justice system." (*Ibid.*) But an action under section 11580 is not a second bite at the apple. The statute does not offer an opportunity to retry issues, reweigh evidence, or make a collateral attack.

As the Restatement indicates, "[a] lawyer communicating with a nonclient on behalf of a client *is not privileged* to make a material misrepresentation of fact . . . to the nonclient." (Rest.3d, Law Governing Lawyers, § 98, p. 58, italics added.) Similarly, "a lawyer who is known to represent a person in a negotiation will be understood by nonclients to be making nonimpartial statements, in the same manner as would the lawyer's client. Subject to such

an understanding, the lawyer *is not privileged* to make [knowing] misrepresentations . . . ." (*Id.* at p. 60, italics added.)

LaBelle has the burden of establishing that the privilege applies (see *Edwards v. Centex Real Estate Corp., supra,* 53 Cal.App.4th at p. 37), and he has failed to do so, at least at the pleading stage of the case.

Nothing in *Home Ins. Co., supra,* 96 Cal.App.4th 17, is to the contrary. There, the defendant in a personal injury action was provided a defense by Zurich Insurance Company. During the litigation, defense counsel allegedly made a fraudulent statement about policy limits, saying they were $15,000 when they were really $500,000. Based on that statement, the plaintiffs settled for $15,000. Upon learning of the misrepresentation, the plaintiffs' *insurer* sued Zurich for fraud. The trial court dismissed the case on demurrer. The Court of Appeal affirmed, holding that the action was barred by the litigation privilege.

The court in *Home Ins. Co., supra,* 96 Cal.App.4th 17, did not consider the applicability or effect of section 11580, under which an injured party becomes a third party beneficiary of the insurance policy and may bring a direct action against the insurer. (See *Murphy, supra,* 17 Cal.3d at pp. 940, 942-943.) And the injured party's rights are to be protected "as if [he or she] had been specifically named in the policy." (*Malmgren v. Southwestern A. Ins. Co., supra,* 201 Cal. at p. 33; accord, *Johnson v. Holmes Tuttle Lincoln-Merc., supra,* 160 Cal.App.2d at p. 298.) These considerations were not present in *Home Ins. Co.,* which involved an action brought by an *insurer.* "A case is not authority for points not decided." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 88 [87 Cal.Rptr.2d 754].)

In sum, the litigation privilege does not protect LaBelle's alleged fraudulent statements about insurance coverage. The Shafers have a right to pursue a fraud claim against him. The trial court erred in sustaining the demurrer without leave to amend.[7]

## C. *Conspiracy Claim*

Civil Code section 1714.10, subdivision (a) provides: "No cause of action against an attorney for a civil conspiracy with his or her client

---

[7]Our analysis of the litigation privilege is based on the principles furthered by section 11580 and the case law recognizing that an attorney may be held liable for making fraudulent statements to a nonclient. We do not mean to suggest that coverage counsel may be held liable for "bad faith" conduct in violation of the covenant of good faith and fair dealing. That type of liability may be imposed only on the insurer. (See, e.g., *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 576 [108 Cal.Rptr. 480, 510 P.2d 1032]; *Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 508-511 & fn. 10 [169 Cal.Rptr. 478].)

arising from any attempt to contest or compromise a claim or dispute, and which is based upon the attorney's representation of the client, shall be included in a complaint or other pleading unless the court enters an order allowing the pleading that includes the claim for civil conspiracy to be filed after the court determines that the party seeking to file the pleading has established that there is a reasonable probability that the party will prevail in the action. . . ." (Hereafter section 1714.10.)

"[T]he legislative purpose of section 1714.10 [is] to eliminate frivolous allegations that attorneys have conspired with their clients. This statutory purpose is served by . . . a prefiling procedure to determine whether the proposed conspiracy pleading is legally sufficient, and whether it is supported by a sufficient prima facie showing of facts to sustain a favorable decision *if the evidence submitted by the petitioner is credited*. If either of these requirements is not met, the petition must be denied; if both are satisfied, it must be granted." (*Hung v. Wang* (1992) 8 Cal.App.4th 908, 931 [11 Cal.Rptr.2d 113], italics added.)

"[T]he motion required by such statutes [as section 1714.10] operates like a demurrer or motion for summary judgment in 'reverse.' Rather than requiring the defendant to defeat the plaintiff's pleading by showing it is legally or factually meritless, the motion requires the plaintiff to demonstrate that he possesses a legally sufficient claim which is 'substantiated,' that is, supported by competent, admissible evidence." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 719 [34 Cal.Rptr.2d 898, 882 P.2d 894], italics omitted.)

"The procedure under section 1714.10 is similar to the procedure employed in the determination of a motion for summary judgment, with a single material difference: under section 1714.10, the burden of proof is shifted to the plaintiff. In this way, the statutory requirement is similar to the showing required of [a] plaintiff who responds to a motion for summary judgment under the Federal Rules of Civil Procedure. . . .

"Under federal law, 'summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' . . . '. . . [A]t the summary judgment stage the judge's function is *not . . . to weigh the evidence* and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . .'" (*Hung v. Wang, supra*, 8 Cal.App.4th at pp. 931-933, italics added.) Thus, to the extent the parties' evidence is in conflict, the facts and inferences supported by the plaintiff's evidence must be accepted as true. (See *Ortiz v. Los Angeles Police Relief Assn.* (2002) 98 Cal.App.4th 1288, 1298-1299 [120 Cal.Rptr.2d 670].)

 In general, "[a] cause of action for civil conspiracy may not arise . . . if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing and was acting only as the agent or employee of the party who did have that duty." (*Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39, 44 [260 Cal.Rptr. 183, 775 P.2d 508].) " 'Agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage. . . .' " (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 512, fn. 4 [28 Cal.Rptr.2d 475, 869 P.2d 454].) But there is an exception to the general rule for "claims against an attorney [who] conspir[es] with his or her client to cause injury by violating the attorney's own duty to the plaintiff." (*Doctors' Co. v. Superior Court, supra,* 49 Cal.3d at p. 47.)

 Consistent with that exception, section 1714.10, by its own terms, "shall not apply to a cause of action against an attorney for a civil conspiracy with his or her client, where . . . the attorney has an independent legal duty to the plaintiff . . . ." (§ 1714.10, subd. (c)(1).)

As already discussed (see pt. II.A.1., *ante*), LaBelle had a duty to provide truthful information to the Shafers in describing the insurance coverage afforded by Truck. That duty existed by virtue of LaBelle's status as coverage counsel, independent of any duties that Truck may have had as an insurer. " '[A]gents [may be] held subject to liability for conspiracy to commit actual fraud since they ha[ve] a duty to abstain from injuring the plaintiff through express misrepresentation, independent of the insurer's implied covenant of good faith and fair dealing.' " (*Pavicich v. Santucci, supra,* 85 Cal.App.4th at p. 392, italics omitted, quoting *Doctors' Co. v. Superior Court, supra,* 49 Cal.3d at p. 48.) Because LaBelle had a duty to refrain from injuring the Shafers through express misrepresentation, section 1714.10 does not apply. (See *Pavicich v. Santucci, supra,* 85 Cal.App.4th at pp. 397-398.)

We reject LaBelle's contention that the Shafers "merely alleged" fraud. The two reservation of rights letters and LaBelle's letters to the Shafers' attorney were attached to the complaint, as was LaBelle's letter to Lundblad at Truck stating that the first reservation of rights letter was being modified "so as to not trigger the <u>Cumis</u> obligation." And in accordance with special pleading requirements that apply to fraud claims (see *Wilson v. Houston Funeral Home* (1996) 42 Cal.App.4th 1124, 1139 [50 Cal.Rptr.2d 169]), the Shafers alleged each element of fraud with specificity.

Nor is LaBelle correct in arguing that the Shafers had to seek leave of court, supported by affidavits, to bring the conspiracy claim. In certain

circumstances section 1714.10 requires a plaintiff to obtain a "court . . . order allowing the pleading that includes the claim for civil conspiracy to be filed" (§ 1714.10, subd. (a)), but "[n]o such order is required for claims against an attorney for conspiring with his or her client where: [¶] . . . the attorney had an independent legal duty to the party who is now the plaintiff in the instant case." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2002) ¶ 6:357, p. 6-70.6, italics omitted; accord, § 1714.10, subd. (c).)

"A cause of action for conspiracy will lie against agents and employees of insurers even though the former are not parties to the agreement of insurance when they join the insurer in a conspiracy to defraud the insured. As such, they are jointly liable with those with whom they conspire to commit the tort." (*Younan v. Equifax Inc.*, *supra*, 111 Cal.App.3d at p. 511, cited with approval in *Everest Investors 8 v. Whitehall Real Estate Limited Partnership XI* (2002) 100 Cal.App.4th 1102, 1108 [123 Cal.Rptr.2d 297], and *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th at pp. 512-513.)

That principle of liability is not limited to fraud perpetrated upon an insured. (*Pavicich v. Santucci*, *supra*, 85 Cal.App.4th at pp. 397-398.) "[A]n attorney [may be liable if he or she] commits actual fraud in his dealings with *third parties*." (*Id.* at p. 395, italics added; accord, *Goodman v. Kennedy*, *supra*, 18 Cal.3d at p. 346; *Buckley v. Gray*, *supra*, 110 Cal. at p. 342; *Jackson v. Rogers & Wells*, *supra*, 210 Cal.App.3d at p. 345; *Cicone*, *supra*, 183 Cal.App.3d at pp. 201-202; *Fire Ins. Exchange*, *supra*, 643 N.E.2d at pp. 312-313; *Hansen*, *supra*, 630 N.W.2d at pp. 825-826; *Slotkin*, *supra*, 614 F.2d 301; Rest.3d, Law Governing Lawyers, § 98, coms. a-c, pp. 58-59.)

Thus, the Shafers may sue LaBelle for allegedly conspiring with Truck to commit actual fraud.

### III

#### DISPOSITION

The judgment is reversed. Appellants are entitled to costs on appeal.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.

A petition for a rehearing was denied April 8, 2003, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied July 16, 2003. Brown, J., did not participate therein. Kennard, J., and Chin, J., were of the opinion that the petition should be granted.